UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Terves LLC, | ) | |
| | ) | Case No. 1:19-cv-01611-DCN |
| Plaintiff, | ) | |
| | ) | Judge Donald C. Nugent |
| v. | ) | |
| | ) | **Terves LLC's Motion** |
| Yueyang Aerospace New Materials Co. Ltd. | ) | **for Summary Judgment** |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |

# **Exhibit 8**

Dr. Lee Swanger Oct. 1, 2021
Validity and Enforceability Report

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**Case No. 1:19-cv-1611-DCN**

**The Honorable Donald C. Nugent**

**Terves LLC**

**v.**

**Yueyang Aerospace New Materials Co. Ltd.**
**et al.**

**Rebuttal Report of Lee A. Swanger, Ph.D., P.E.**

**October 1, 2021**

## I.    Introduction

### A.    Background/scope of engagement

Attorneys for Terves LLC have retained me and my colleagues at Exponent, Inc. to perform certain metallurgical and corrosion tests on several magnesium alloys sold by Ecometal, Inc. and to compare the results of those tests to the claims of two U.S. Patents assigned to Terves LLC: U.S. Patent 10,329,653 (the '653 Patent) and U.S. Patent 10,689,740 (the '740 Patent).  I have also been asked to review and evaluate the Expert Report of Dr. Dana Medlin, dated July 27, 2021, including the Exhibits thereto.  In that Report, Dr. Medlin asserts that the '653 Patent and the '740 Patent are invalid due to anticipation, obviousness, or indefiniteness in consideration of the following prior art publications: 1) *Chinese Patent Publication No. CN 103343271* by Xiao ("Xiao"); 2) *Development of high strength magnesium bases composites using elemental nickel particulates as reinforcement* by S.F. Hassan and M. Gupta (referred to as "Hassan" by Dr. Medlin); 3) *U.S. Patent No. 9,759,035* by Fripp ("Fripp '035"); 4) *U.S. Patent No. 10,156,118* by Fripp ("Fripp '118"); 5) *U.S. Patent 2, 219,022* by Salnikov ("Salnikov '022"); 6) *U.S. Patent 2,261,292* by Salnikov ("Salnikov '022"); 7) *U.S. Patent 2,329,157* by Frack ("Frack"); 8) *U.S. Patent 3,106,959* by Huitt ("Huitt"); 9) *U.S. Patent 8,844,936* by Oxford ("Oxford"); and 10) *Chinese Patent Publication No. CN103602866A* by Jin ("Jin").  In that report, Dr. Medlin also challenges my conclusions in my reports dated October 6, 2020 and November 20, 2020, wherein I concluded neither Xiao nor Hassan, nor Xiao and Hassan invalidate the claims of the '653 Patent or the '740 Patent. I have provided five earlier reports in this matter, dated April 28, 2020, May 4, 2020, August 6, 2020, October 6, 2020, November 20, 2020, and July 27, 2021 which I incorporate herein by reference.  I have also given depositions in this matter on June 3, 2020 and on October 12, 2020 and incorporate the transcripts of those depositions, with the respective errata sheets, in this report by reference.

1907404 - 2109

## B.      Qualifications

I am employed by Exponent, Inc. as a Principal Engineer, and Director of Exponent's Miami, Florida office. My background is in the area of both metallurgical engineering including physical metallurgy and mechanical engineering. I have a B.S. in Metallurgy, with Highest Honors, from the Case Western Reserve University, an M.S. in Materials Science and Engineering from Stanford University, and a Ph.D. in Materials Science and Engineering, also from Stanford University. I then joined The Ohio State University Department of Materials Science and Engineering as a Post-Doctoral Research Associate studying corrosion, in conjunction with Professor Mars Fontana and Professor Roger Staehle. I have served as an Adjunct Professor of Engineering, teaching metallurgical engineering, at the University of Miami, and at Cleveland State University. I am a Registered Professional Engineer in several states, including Ohio, in both metallurgical engineering and in mechanical engineering, and have been a member of ASM International (formerly the American Society for Metals) since 1968. As set forth in more detail in my curriculum vitae (Exhibit A), I have substantial experience in the areas of metallurgical engineering and alloy design. Prior to joining Exponent, I was Director of Research and Development for the Engine Parts Division of Gould, Inc. While at Gould, I was the sole inventor of U.S. Patent 4,333,215 in the metallurgical art, and assisted my attorney in the prosecution of that patent. One of my responsibilities at Gould was the management of its intellectual property portfolio, including monitoring progress on research and development projects and monitoring patent applications.

## C.      Facts and Data Considered

A listing of the facts, documents and items considered in the course of this analysis and report is attached hereto (Exhibit B).

## D.      Any Exhibits that may be used at hearing

I reserve the right to use as exhibits in support of my testimony any material referred to in my April 28, 2020, May 4, 2020, August 6, 2020 October 6, 2020, November 20, 2020, and July 27, 2021 reports, this report and/or the exhibits thereto, my deposition transcripts and exhibits and any demonstrative or summary exhibits explaining, illustrating or summarizing any of the opinions expressed in this report or the information contained in it, referenced by it, or reviewed in connection with it.

## E.      List of all publications authored in previous 10 years

A list of my publications is included in the resume attached (Ex. A).

## F.      A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition

My list of sworn testimony is attached hereto (Exhibit C).

### G.  Statement of compensation to be paid for the study and testimony in the case

I am a salaried employee of Exponent, Inc.  My employer charges for my professional services at the rate of $575 per hour.  Neither my employer nor I have any financial interest in the outcome of this matter.

## II.  Applicable Law

**Claim Construction**

1. I understand that the parties agreed to the construction of certain claim terms in two documents: the *Joint Claim Construction and Prehearing Statement* (ECF 50), and the *Joint Memorandum on Agreements re Certain Disputed Claim Terms* (ECF 86).

2. In the *Joint Claim Constructions and Prehearing Statement* (ECF 50), the parties agreed to the following:

   **A.**  **Additive material:** a material that is added.

   **B**.  **Secondary metal:** an additional metal that is added.

   **C.**  **Forming precipitant:**

      **i.**  **Forming:** coming into existence
      **ii.**  **Precipitant:** something having a new phase different from what existed before.

   **D.**  **Morphology of said galvanically-active intermetallic phases:** shape of said galvanically-active intermetallic phases.

3. In the *Joint Memorandum on Agreements re Certain Disputed Claim Terms* (ECF 86), the parties agreed to the following:

   **E.**  **Composite**: a material made of two or more components.

   **F.**  **in situ precipitation/precipitate / in situ precipitated intermetallic phase**:
      "in situ":  in place
      "precipitant/precipitate/precipitation": something having a new phase different from what existed before.

   **G.**  **Controlled Dissolving**: Parties agree the term does not require construction because it is not a limitation of the claims.

   **H.**  **controlled selection of a mixing technique**: a non-random selection of a mixing technique.

    **I.**     **solutionizing**: a heat treatment process step.

4. The Court also issued a *Memorandum Opinion and Order* (ECF 89). The Court identified that the agreed constructions are as follows:

    A. <u>Agreed Terms</u>

        The agreed constructions are as follows:

        1.    "*composite*": a material made of two or more components

        2.    "*in situ*": in place

        3.    "*precipitation"/"precipitate"/"precipitated"/"precipitant*": something having a new phase different from what existed before

        4.    "*controlled selection of a mixing technique*": a non-random selection of a mixing technique

        5.    "*solutionizing*": a heat treatment process step

        6.    "*additive material*": a material that is added

        7.    "*secondary metal*": an additional metal that is added

        8.    "*forming*": coming into existence

        9.    "*morphology*": shape

5. The Court then made a determination of the following terms:

    **Intermetallic Phase:** solid compound that has a combination of two or more metals

    **Galvanically-Active:** No construction is warranted.

    **Unalloyed Additive Material**: Further explanation is not necessary to aid the court or the jury in understanding this term as it is used in the claimed invention.

    **Sufficient quantities:** Further explanation is not necessary to aid the court or the jury in understanding this term as it is used in the claimed invention.

    **Improve tensile strength, ductility, or combination thereof**: provide a greater tensile strength (resistance of a material to break under tension), greater ductility (ability to undergo deformation before rupture), or combinations thereof.

    **Melting Point/Melting Temperature**: the temperature at which liquid is first formed.

**Portion of said additive materials forming solid particles/a portion of said additive material remaining unalloyed additive material**: This term is not indefinite by clear and convincing evidence, and the term needs no further construction.

6. For my report and for my opinions, I am using the Court's Order (ECF 89) regarding the claim construction terms as well as the parties' stipulations in the *Joint Claim Construction and Prehearing Statement* (ECF 50), and the *Joint Memorandum on Agreements re Certain Disputed Claim Terms* (ECF 86).

7. The parties have not agreed on a definition for the claim term "plurality" and the Court has not construed this term. Claim 19 of the '740 Patent uses the term "plurality" which is defined in the Merriam Webster Ninth New Collegiate Dictionary as 1 a: the state of being plural (i.e. more than one, or in some languages more than two), b: the state of being numerous, c: a large number or quantity.  I understand that courts have construed "plurality" in claims consistent with the term's ordinary meaning to mean "two or more." E.g., Dayco Products, Inc. v. Total Containment, Inc., 258 F.3d 1317, 1327-28 (Fed. Cir. 2001) ("In accordance with standard dictionary definitions, we have held that 'plurality,' when used in a claim, refers to two or more items, absent some indication to the contrary."). I use the definition of plurality to mean "two or more" consistent with the dictionary definition and with referenced Federal Circuit opinion.

## Legal Standard for Infringement

I apply a two-step analysis to determine whether accused devices literally infringe a patent's claims. First, the claims are "construed to determine their scope." Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001). Second, "the claims must be compared to the accused device." Id. "Literal infringement exists when every limitation recited in the claim is found in the accused device." Akzo Nobel Coatings, Inc. v. Dow Chem. Co., 811 F.3d 1334, 1341 (Fed. Cir. 2016). "

## Anticipation

I have been told that under 35 U.S.C. § 102, to show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention.

## Obviousness

I have been told that under 35 U.S.C. § 103(a), and proven by clear and convincing evidence, "[a] patent may not be obtained although the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

When considering the issues of obviousness, I have been told that I am to analyze the following four factors:

        a.     Determine the scope and content of the prior art;

        b.     Ascertain the differences between the prior art and the claims at issue;

        c.     Resolve the level of ordinary skill in the pertinent art; and

        d.     Consider evidence of objective indicia of non-obviousness.

*Timeframe*: I have been told that the relevant time for considering whether a claim would have obvious to a POSITA at the time of alleged invention, which I have assumed is before the priority filing date of the '653 and '740 Patents, April 18, 2014.

I have been told that the teachings of two or more references may be combined with each other as part of determining the differences between the prior art and the claims. However, the accused infringer has to show that a POSITA would be motivated to combine those references. If there is no evidence of motivation to combine the teachings of two or more references, then a POSITA would not have combined them.

I have been told that analyzing these four factors to determine either obviousness or non-obviousness must not be done through impermissible hindsight analysis, but rather must be done from a view of that hypothetical POSITA at or before the time of the invention. In addition, I have been informed and I understand that there must be a reasonable expectation of success— not absolute predictability of success—in combining prior art teachings to arrive at the claimed invention. Without that reasonable expectation of success there can be no obviousness finding.

As a safeguard against slipping into use of hindsight, and to resist the temptation to read into the prior art the teachings of the invention at issue, evidence of objective indicia of non-obviousness must be analyzed prior to making the ultimate determination of whether or not an invention is obvious.

Objective indicia of non-obviousness often are the most probative and cogent evidence of non-obviousness.

Failure to give proper consideration to such evidence can be fatal, because a hindsight view of obviousness may not be so apparent in view of objective evidence of non-obviousness.

Evidence showing objective indicia of non-obviousness can include copying, long-felt but unresolved need, praise by others, and commercial success. I have been told that any assertion of objective indicia must be accompanied by a nexus between the patent claims and the evidence offered.

    *Copying*: Copying may indeed be another form of flattering praise for inventive features. Copying requires evidence of efforts to replicate a specific product. This may be demonstrated either through internal documents such as disassembling a patented product

and building a virtually identical replica of that patented product; or access to, and substantial similarity to, the patented product.

*Long-Felt But Unresolved Need*: Long-felt need is particularly probative of non-obviousness when it demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand.

*Praise by Others*: Praise from industry participants, especially competitors, is probative as to non-obviousness.

*Commercial success*: The commercial success of a product protected by the patented invention is strong evidence of non-obviousness. To show commercial success, a nexus must exist between the patented features and why customers purchased the patented product.

## Indefiniteness

The Supreme Court held that a patent claim is indefinite if, when "read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct. 2120, 2124, 189 L.Ed.2d 37 (2014).

"Reasonable certainty" does not require "absolute or mathematical precision." Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1381 (Fed. Cir. 2015). The accused infringer has the burden of proving indefiniteness by clear and convincing evidence. Id. at 1377. See also BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1365 (Fed. Cir. 2017)

"[A]n inventor need not explain every detail because a patent is read by those of skill in the art." Wellman, Inc. v. Eastman Chem. Co., 642 F.3d 1355, 1367 (Fed. Cir. 2011).

"The mere observation of information not 'recited' [in a patent] does not answer the question whether a person of ordinary skill in the art would need to be given the level and measurement information to understand, with reasonable certainty, whether a composition is 'effective to catalyze' the SCR (of NOx) or AMOx reactions." BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1366 (Fed. Cir. 2017) (reversing indefiniteness for term "effective to catalyze" as that term does not need to be defined with any absolute or mathematical precision and fact that "x" can be numerous different responses does not make it indefinite).

A finding of indefiniteness based on a broad scope is legally incorrect: "breadth is not indefiniteness." SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1341 (Fed. Cir. 2005) (internal brackets omitted). See also BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1367 (Fed. Cir. 2017) (district court's finding of "a practically limitless number of materials" goes to broad claim scope and does not support conclusion of indefiniteness).

"Nothing inherent in the standard of 'reasonable certainty' precludes a relevant skilled artisan from understanding with reasonable certainty what compositions perform a particular function." BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1366 (Fed. Cir. 2017).

The Federal Circuit has "long held" that nothing in the law precludes, for indefiniteness, "defining a particular claim term by its function." Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d 1367, 1374–75 (Fed. Cir. 2014); see Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP, 838 F.3d 1224, 1232 (Fed. Cir. 2016) (explaining that claims "are not per se indefinite merely because they contain functional language"), Microprocessor Enhancement Corp. v. Tex. Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008) (explaining that "apparatus claims are not necessarily indefinite for using functional language"); In re Swinehart, 439 F.2d 210, 212 (CCPA 1971) (ruling that "there is nothing intrinsically wrong with the use of such a technique in drafting patent claims").

## III.     Summary of Opinions

All of the elements or limitations of the asserted claims ('653 Patent claims 1-5, 7-8, 12-15, 18-20, 23, 25-27, 29-31, 33- 35, 37-39, 41-43, 45-47, 49-50, 52-61, 64, 66-67, 69-70, 74, 76 and '740 Patent claims 2-5, 8-11, 13, 16-17, 19-47, 51-69, 76-103) are infringed by the seven accused Ecometal magnesium composites (AJM006, AJM010, AJM012, AJM016, AJM017, AJM018, and AJM023.)  See my report of July 27, 2021, incorporated herein by reference, for the detailed analysis.

Xiao does not anticipate or make obvious claims 1, 4, 5, 8, 11, 13, 25, 29, 33, 37, 41, 43, 45, 49, 55, 69, 70, 71, 73, or 74 of the '653 Patent or claims 2, 19, or 94 of the '740 Patent because Xiao does not disclose each and every element of any of the asserted claims.  Similarly, Xiao in view of Hassan does not anticipate or make obvious claims 7, 12, 13, or 71 of the '653 Patent because Hassan does not disclose each and every element of any of the asserted claims. Dr. Medlin has not performed any analysis to attempt to show that any of the asserted claims are obvious under either Xiao or Hassan, so his conclusory statement that the claims of the '653 Patent and '740 Patent are obvious is meaningless.

Nor do Fripp '118 or Fripp '035 anticipate or make obvious claims 1, 4, 5, 11, 13, 29, 37, 41, 43, 45, 49, 69, 70, 71, or 73 of the '653 Patent or claims 2, 19, or 94  of the '740 Patent. Dr. Medlin has not addressed several of the claim limitations relative to the claims that Dr. Medlin states are invalidated by the Fripp references. By that point alone, the Fripp references cannot anticipate or make obvious the '653 Patent or '740 Patent. Even as to the limited claim references Dr. Medlin does selectively address, none are disclosed or made obvious by the Fripp references because Dr. Medlin severely overstates what the very broad Fripp references teach. Neither Fripp reference teaches or makes obvious the '653 Patent or '740 Patent, so Dr. Medlin's conclusory statement that ignores the context of the references and further ignores the '653 Patent and '740 Patent claim limitations is incorrect.

All of the claims are also definite. (Medlin Report as to '653 Patent claims 1, 12, 25, 29, 33, 37, 41, 45, 73, and 74; and '740 Patent claims 2, 19, 82-93, 94, 102, and 103.) Dr. Medlin's opinions on indefiniteness are incorrect as they ignore the many references in the specifications of both patents and ignore the standard practices that would be well-known by a POSITA. Dr. Medlin has failed to consider the subset of claim terms that he addressed in the context of the claims, or in the context of the specifications in the '653 Patent and '740 Patent. The concepts of chemistry, thermodynamics and dissolvable metallurgy would be understood by a POSITA and Dr. Medlin ignores this knowledge to reach his, and only his, opinion on the indefiniteness of basic claim terms.

I reach these conclusions with at least a reasonable degree of scientific and engineering probability.

## IV. Background of the Xiao Patent

The Xiao invention is for a "light and pressure-proof fast-decomposed cast magnesium alloy" which "can be used as a tripping ball material for a multi-stage sliding sleeve staged fracturing technique." The magnesium alloy disclosed and claimed in claim 1 of Xiao is very rich in the alloy elements aluminum (13 to 25 weight percent) and zinc (2 to 15 weight percent). Dependent claim 2 of Xiao adds additional trace elements comprising iron (Fe), copper (Cu), nickel (Ni), zirconium (Zr) **and** titanium (Ti). I understand that the term "comprising" means the invention includes but is not limited to the elements identified in the claim. I also understand that the conjunction **and**, emphasized above, requires all of the listed trace elements, not a subset thereof. Therefore Xiao discloses and claims the complete collection of trace elements, and not a menu for selection of one or more of the trace elements.

I have reviewed the Chinese language version of Xiao. It is clear, without being able to read Chinese, that the table at [0062] has as its first entry in column 1 the widely used commercial magnesium alloy AZ91D, and that row lists the well-known alloying elements in this alloy. The final column, labeled "Mg," clearly refers to magnesium as the balance, or the remainder of the alloy. The next seven rows, by comparison, would identify other magnesium alloys by alloying additions and their elemental composition, with the same Chinese characters under Mg also indicating that the balance of the alloy is magnesium.

Xiao at [0064] shows a table with seven rows, corresponding to the seven rows of [0062] with the same first-column entries, and with three columns of data. The first column uses the Greek letter σ (sigma) which is the universal symbol for stress. In the second column the units (MPa) are megapascals, used to denote tensile strength or yield strength, and the values for the Xiao examples 1 through 7, ranging from 360 MPa to 410 MPa, equivalent to 52,000 psi to 60,000 psi, are typical for light-weight non-ferrous metal alloys such as magnesium and aluminum alloys, and clearly superior to the strength listed for AZ91D of 232 mPa or 34,000 psi. The next two columns, with units of gm.cm$^{-2}$.h$^{-1}$ (grams per square centimeter per hour), indicate changes in mass per unit area per unit time. Multiplying the values by 1,000 will convert them to milligrams per square centimeter per hour, the same units used in the claims of the '740 Patent. These values are either

a rate of weight gain or a rate of weight loss, and for a "fast-decomposed cast magnesium alloy" the values would be weight *loss* rates, as claimed in the '653 Patent and '740 Patent.

Xiao is distinguishing his invention over the well-known magnesium alloy AZ91D, which is inferior to Xiao's composites in mechanical properties, and which lacks the enhanced corrosion rate in hot brine to be useful in gas and oil well operations. Thus, a POSITA would discount any information about AZ91D as disclosing anything of value with respect to strong, dissolvable magnesium alloys.

Paragraph [0026] of Xiao discloses the mechanism by which the corrosion decomposition of the "magnesium alloy with a high aluminum content (13 to 25% by weight) and a high zinc content (2 to 10% by weight) …" occurs. That mechanism is the formation of a beta phase ($Mg_{17}Al_{12}$) regions on the grain boundaries of the magnesium alloy, which together with the alpha phase magnesium, function as a large number of "micro-batteries, which greatly accelerate the corrosion decomposition of magnesium alloy." The sole mention of the term "intermetallic" occurs later in paragraph [0026] where it is stated that "Elements such as Fe, Cu, Ni, Ag, etc., in the magnesium alloy can form a large number of intermetallic composite micro-particles, which can improve the corrosion performance of the magnesium alloy, thereby promoting the decomposition of the magnesium alloy."

## V.     Background of the Hassan Publication

The paper by Hassan and Gupta describes the research to develop a superior alternative to the commercial AZ91-silicon carbide reinforced magnesium alloy. The goal was to develop a metal-metal composite (MMC) magnesium alloy with **superior mechanical (strength and ductility) properties** compared to the commercial alloy. As stated by Hassan and Gupta, "The results further revealed that both engineering and specific 0.2% YS and UTS, and ductility of $Mg/7.3Ni_p$ and $Mg/14Ni_p$ composites remained much superior even when compared to the high strength magnesium AZ91 reinforced with much higher volume percentage of $SiC_p$." Notably, the words "corrode," "corrosion," "dissolve," and "dissolution" do *not* appear in this publication. A POSITA would dismiss Hassan out of hand when looking for any information being disclosed that would benefit the search for a strong dissolvable magnesium composite for use in oil and gas well development. More specifically, Hassan lists the strength of AZ91D with 15 volume % SiC particle reinforcement at 289 mPa, and presents the strength of his Mg-Ni particle composites as between 313 mPa and 463 mPa., significantly better than the best AZ91D composite, and in line with the strength of the Xiao Examples 1 through 7. Again, AZ91D is the commercial standard of comparison, and a POSITA would not be looking to Gupta for any information about AZ91D, which is the inferior alloy in the Gupta publication.

## VI.     Background of the Fripp '035 Patent

This Fripp patent is for wellbore isolation devices that can be removed by the galvanic corrosion of a component consisting of a metal alloy in *solid* solution. Much of the patent describes the

mechanical details of isolation devices for wells, and then also describes a discovery that a metal alloy, which is magnesium based, but has the alloying element or elements in <u>solid solution</u>, will dissolve in the presence of electrolytes.  A <u>solid solution</u> is a homogeneous solid phase containing a mixture of two or more kinds of atoms, evenly distributed, which do not separate naturally (Reed-Hill, **Physical Metallurgy Principles** 2nd Edition,1973).  Galvanic corrosion is described, and the inventors note that the dissolving component can be the anode of a galvanic couple, while a different component of the isolation device can be the cathode.  Alternatively, the metal alloy with the alloying element in solid solution will itself dissolve in various electrolytes without distinct cathodes and anodes present in the magnesium alloy.

The Fripp '035 patent lists 51 possible alloying elements for use with magnesium, over half of the entire periodic table for metals.  The patent specifically teaches:

> The magnesium and the at least one other ingredient are in a solid solution
> and not in a partial solution or a compound where inter-granular inclusions
> may be present

(Column 6, lines 58-60).  Where precipitation hardening is mentioned, in column 7, lines 37-40, it is only to "strengthen the metal alloy."  The materials disclosed for this precipitation hardening are aluminum, zinc, zirconium and/or thorium.  In particular, copper, nickel and cobalt are NOT disclosed as forming precipitates in magnesium.  In column 9, the distinction between solid-solution alloys and precipitation age-hardening is made, but only to create a metal alloy that is resistant to mechanical property changes over time.  No disclosure of in-situ galvanically active precipitates is present in the '035 patent.

Dissolution is described in terms of dissolution TIME, not dissolution RATE.  The dissolution times taught in the '035 patent are from "1 hour to about 2 months."  Where modification of the dissolution time is discussed, it is in terms of additive materials to INCREASE the dissolution time, stating that, " . . . beryllium, cerium, praseodymium, thorium, yttrium, neodymium, terbium, gadolinium, and zirconium can be included in the metal alloy to reduce the reaction rate."

The only mention of inter-metallic compounds is to note that manganese will combine with traces of iron to form non-reactive inter-metallic compounds.  There is no disclosure that inter-metallic compounds can induce a rapid controlled dissolution rate.

In summary, the '035 patent describes solid-solution magnesium alloys, in which the magnesium can be alloyed with an unspecified amount of 51 different elements, to achieve unspecified dissolution times, at unspecified temperatures, in unspecified electrolyte liquids.

## VII.    Background of the Fripp '118 Patent

This Fripp patent is for time-delay coatings for some of the components in wellbore isolation devices.  This patent followed Fripp '035, and uses the same Fig. 1 as Fripp '035.  The '118 patent describes coatings for one of the dissolvable components of an isolation device, to protect it from premature corrosion.  When desired, the coating is compromised by cracking, flaking, mechanical

abrasion, or dissolution, exposing the dissolvable component to an electrolyte.  The coating can be mechanically compromised by impacting it with a solid impactor, by differential thermal expansion or contraction by pumping heated or cooled fluids into the wellbore, or by abrading it with a down-hole brush mechanism.  If made from a polymeric material, the polymer coating may be compromised by chemical or thermal means.  If made from a dissolvable material, the coating itself can be compromised by exposure to an electrolyte.

Galvanic corrosion is described as one means of compromising the coating, and as in the '035 patent, the discovery that certain magnesium alloys can corrode without specific cathodes being present (i.e. a solid solution magnesium alloy) is disclosed.

Eutectic melting of certain alloys is also described as a means of compromising the coating, via a phase transformation.  Eutectics are not precipitates, so the description of eutectic alloys does not disclose in-situ galvanically active precipitates.

The Fripp '118 patent states that isolation devices must isolate zones of a formation for one month or more, up to about 2 months.  The coating described can resist dissolution for up to the 2 month time period.

The component being protected by the coating is described as potentially consisting of a multi-piece assembly, primarily for the development of desired mechanical properties, but also to introduce distinct cathode pieces into the component during its initial manufacture, and not during subsequent in-situ precipitation of galvanically active precipitates.


## VIII.   Invalidity Analysis

### A.      Dr. Medlin's Analysis of Xiao Cannot Support Anticipation or Obviousness

As I have explained before, contrary to Dr. Medlin's unsupported conclusions, Xiao does not disclose "in situ precipitation of galvanically active intermetallic phases to enable controlled dissolution of said magnesium composite."  Therefore, Xiao *cannot* anticipate or make obvious claims 1, 4, 5, 8, 11, 13, 25, 29, 33, 37, 41, 43, 45, 49, 55, 69, 70, 71, 73, or 74 of the '653 Patent or claims 2, 19, or 94 of the '740 Patent as asserted by Dr. Medlin.

Medlin cites to Paragraph [0026] of Xiao to attempt to show the disclosure of the above claim limitation.  Notably, with respect to both the '653 Patent and '740 Patent, Dr. Medlin selectively quotes from Xiao [0026] as follows:

> The present invention adopts a magnesium alloy . . . and further adds elements of Fe, Cu, Ni, and Ag which can enhance the corrosion performance of the magnesium alloy . . .

Dr. Medlin's ellipsis avoids the key language that contradicts his opinion.  The complete quote from Xiao [0026] is below:

> The present invention adopts a magnesium alloy **with a high aluminum content (13 to 25% by weight) and a high zinc content (2 to 10% by weight)** and further adds elements of Fe, Cu, Ni, and Ag which can enhance the corrosion performance of the magnesium alloy . . .

This language missing in Dr. Medlin's analysis explains the necessity of having a high aluminum content – it is the aluminum that enhances corrosion. The optional addition of other elements _with_ the aluminum "_can_" –  but does not have to – further enhance corrosion performance.

Xiao [0026] goes on to state, that the purpose of this high content aluminum, as correctly captured in Dr. Medlin's report, is to cause corrosion:

> . . . in which the purpose of adding the high content of aluminum content is to produce a large amount of cathode phase, the β (Mg17Al12) phase and eutectic phase on the grain boundary of the magnesium alloy, and the magnesium matrix α phase functions as an anode phase, so that the matrix and the grain boundary of the magnesium alloy form a large amount of micro- batteries, which greatly accelerate the corrosion decomposition of magnesium alloy.

Xiao [0026] clearly discloses that the mode of fast corrosion of the magnesium alloy is by the primary action of the micro-batteries formed from the main elements of the alloy, the magnesium and the aluminum. _This does not disclose or teach in any way a galvanically active in situ precipitate._ Instead, Xiao merely discloses a eutectic (formed during solidification) phase on the grain boundary, which is not a galvanically active in situ precipitate as recited in the claims of the '653 Patent or '740 Patent.  Dr. Medlin attempts to respond to my previous October 6, 2020 and November 20, 2020 reports on this point when he claims that: "A PHOSITA in August 2014 would have understood [Xiao's] disclosure of 'intermetallic composite micro-particles' to be a reference to intermetallic participate"; and that "A PHOSITA reading the Xiao reference in April 2014 would have recognized that the precipitation of galvanically-active intermetallic phases ('micro-batteries') are naturally and necessarily generated by the _in situ_ reaction between magnesium and any and all of the disclosed metal additives forming _in situ_ precipitate."  A POSITA in April 2014, however, would know that in metallurgy, precipitation refers to a solid state reaction, wherein a precipitate is nucleated when thermodynamically possible, and grows by diffusion of elements in the solid metal lattice.  The well-known examples of precipitation hardened aluminum structural alloys are representative of the knowledge of a POSITA. In requiring the eutectically formed Mg-Al – Mg micro-batteries, Xiao _teaches away_ from the claims of the '653 Patent and '740 Patent which require galvanically active in situ precipitates formed between the magnesium alloy and the additive material.

These are terms that are used in metallurgy, corrosion engineering, and chemistry that persons of ordinary skill would understand, including galvanic activity (the basis for all batteries and for galvanized steel, and for some basic forms of corrosion), phase equilibria as promulgated via

binary phase diagrams, such as those for Cu-Mg and Mg-Ni, which were attached as Exhibit D to my July 27, 2021 Report, melting and freezing as one of the basic phase transformation, and the formation of new phases which are compounds of two elements.  Because a POSITA would understand these terms, that POSITA would understand that Xiao *does not disclose, teach, or make obvious galvanically-active in situ precipitate.*

For the same reason, Dr. Medlin's similar, but differently-expressed arguments are incorrect: a PHOSITA would not have understood that a precipitate would necessarily be formed in place; the "composite microparticles" disclosed by Xiao are not the same as the claimed "precipitate"; a PHOSITA would not have understood "micro-batteries" to reference the galvanic activity of in situ precipitates.  Dr. Medlin also provides no experimentation to prove that Xiao's particles have any particular size or elemental composition, meaning that Xiao does not disclose or make obvious the limitation required for '740 Patent claim 19.

In fact, claim 1 of Xiao has only the elements of magnesium, aluminum, and zinc, adding up to 100% of the alloy.  No trace elements are *required* to "enable controlled dissolution of said magnesium composite" or alloy.  A POSITA looking at Tables 1 and 2 of Xiao would see that indeed the presence of the elements iron (Fe), copper (Cu), nickel (Ni), and silver (Ag) do not have a marked influence on the corrosion rate of the Xiao Examples 1 through 7.

The Table 1 below shows the total amount of secondary elements (other than aluminum and zinc) in the seven Xiao examples, along with the corrosion rate in 3% KCl solution at 93°C.  The seven Xiao examples are sorted by amount of secondary elements from smallest to largest in this table:

| | weight % Sum of elements Fe, Ni, Cu, Ag, Ti, and Zr | Decomposition Rate in 3% KCl at 93°C mg/cm$^2$-hr |
|---|---|---|
| Example 2 | 0.8 | 45 |
| Example 5 | 1.05 | 48 |
| Example 7 | 2.15 | 57 |
| Example 6 | 4.95 | 63 |
| Example 1 | 8.6 | 74 |
| Example 4 | 10.9 | 58 |
| Example 3 | 15.5 | 36 |

Table 1.  Secondary element concentrations and dissolution rates
of Xiao Examples 1 through 7, sorted by sum of secondary elements
Source:  Xiao Tables 1 and 2

The example with the highest concentration of secondary elements, Example 3, actually has the lowest dissolution rate. A POSITA would notice that there is no correlation between the sum of the secondary elements in the examples, and the dissolution rate of those examples, confirming only that the secondary elements can affect the dissolution rate of the Magnesium-Aluminum-Zinc alloy of Xiao, not that they will enhance and control the dissolution rate, as required by the '653 and '740 patents.

Xiao [0026] goes on to state:

> Elements such as Fe, Cu, Ni, Ag, etc., in the magnesium alloy can form a large number of intermetallic composite micro-particles, which can improve the corrosion performance of the magnesium alloy, thereby promoting the decomposition of the magnesium alloy.

This sentence in Xiao does not disclose the "in situ precipitation of galvanically-active intermetallic phases to enable controlled dissolution of said magnesium composite" claimed in the '653 Patent. Xiao shows that the aggregate of micro-batteries formed between the beta phase ($Mg_{17}Al_{12}$) and the alpha phase magnesium is the basis for promoting decomposition of the magnesium alloy. The aluminum in the beta phase is NOT an in situ precipitated galvanically active intermetallic phase as claimed in the '653 patent. This is because in claim 1 of the '653 patent, for example, the limitation is "said additive material forming precipitant in said magnesium composite", and the "additive material must include one or more metals selected from the group *consisting* of copper, nickel, iron, and cobalt." In contrast to "comprising," "consisting of" is closed and means that the invention is only what is described. Thus, aluminum is NOT an additive material as defined in claim 1 of the '653 Patent, but is a component of the magnesium alloy. The same is true of the '740 Patent.

In the same sentence, Xiao does *not* disclose either an "in situ" or a "galvanically active" precipitate. Instead, that sentence merely states that "Elements such as Fe, Cu, Ni, Ag, etc., in the magnesium alloy **can** form a large number of intermetallic composite micro-particles, which **can** improve the corrosion performance of the magnesium alloy." Nothing in this sentence would lead a POSITA to the conclusion that either an "in situ" precipitate or a "galvanically active" precipitate would be formed. In fact I emphasize that the verb "can" appears in two places in that sentence, which would mean to a POSITA that those additive elements do not necessarily form intermetallic particles, do not form either in situ or galvanically active precipitates, and that those elements do not necessarily improve the corrosion performance of the magnesium alloy. The limitation of claim 1 of the '653 Patent is that in that invention these additive materials **do** form galvanically active in situ precipitated intermetallic particles that **are** necessary to "enable" or allow controlled dissolution of said magnesium composite.

In my opinion a POSITA would not recognize, in the alloy system disclosed in Xiao, that the reaction between magnesium and the metals in the additive material would necessarily form

galvanically active intermetallic particles.  With the high amounts of aluminum and zinc in the alloy, both of which are very reactive metals, Dr. Medlin's incorrect hindsight analysis combined with significant experimentation and evaluation, would be required to determine what compounds, if any, would form between iron, copper, nickel or cobalt and the components of the magnesium alloys disclosed by Xiao. The fatal problem with Dr. Medlin's conclusion is that he did not conduct such experimentation necessary to reach such a conclusion. It is wrong for Dr. Medlin to say that this would have been obvious using only his hindsight and without any supporting evidence such as experimentation. A POSITA would not reach such a conclusion in reading that same sentence.

A POSITA reading this sentence out of Xiao would be at a loss to know that the elements iron, copper, nickel, silver, etc. would react within the magnesium alloy to precipitate galvanically active particles that would enable controlled dissolution (i.e., in their absence, controlled dissolution would not occur) of the magnesium alloy. In addition, a POSITA would not know what the mechanism of improved corrosion performance that "can" (i.e., might) be promoted by the elements iron, copper, nickel, silver, etc. would be.  Those elements might promote a different grain boundary morphology, to enable the MgAl – Mg micro-batteries to perform better.  Those elements might induce porosity which may allow a brine solution better access to the MgAl – Mg micro-batteries.  Those elements might dope the MgAl phase or the Mg phase to increase the electrochemical potential difference between those phases, improving corrosion performance. Those elements might promote dissolution of the corrosion products of the MgAl – Mg micro-batteries, preventing interruption of the corrosion by passive films of corrosion product. Again, I believe that a POSITA reading this in Xiao would readily reach a very different conclusion than what is set forth in the '653 Patent claims.

With its emphasis on the many micro-batteries formed between significant amounts of beta phase (Mg17Al12) and alpha phase magnesium, Xiao also teaches away from the use of the trace elements of iron, copper, nickel, or cobalt to necessarily enable controlled dissolution of magnesium alloys or to create an in situ or galvanically active precipitate with those elements.

Dr. Medlin analyzes claim 1 of Xiao which discloses a range of magnesium percentage in a composite from 60% to 85%, and states that this reference in Xiao discloses the range of magnesium in claim 29 of the '653 Patent, "at least 85 wt.% magnesium."  This same claim limitation is present in claim 19 of the '740 Patent, which allows up to 99.99% magnesium, and 0.01% additive material, and Dr. Medlin simply ignores it.  Thus Dr. Medlin is asserting that Xiao's range of 60% to 85% discloses the '653 Patent claim 29 and '740 Patent claim 19 range of 85% to 99.99%.  This is analogous to the existence of the state of Pennsylvania spanning the territory from its Eastern border to its Western border proves the existence of the state of Ohio, since they Eastern border of Ohio is the Western border of Pennsylvania.  There is no overlap in territory between the state of Pennsylvania and the state of Ohio, and there is no overlap in the range of magnesium disclosed in Xiao claim 1 and the range of magnesium claimed in claim 29 and claim 19, so there is no disclosure of the range in either claim. In mathematical terms, claims 29 and 19 require greater than 85% magnesium, while the Xiao Patent claims less than 85% magnesium; the two ranges do NOT mathematically overlap. Nor does Dr. Medlin provide how

1907404 - 2109                                                                                              Page 16

this higher range would have been obvious in an attempt to explain away this gap. Dr. Medlin simply ignores what the claims say and what they mean to a POSITA.  Dr. Medlin attempts to use Xiao's discussion of AZ91D as being the inferior prior art that Xiao is improving upon, as disclosing the type and range of additive materials (specifically, aluminum, zinc, zirconium, and manganese) claimed in claims 25, 33, 41, and 55 of the '653 Patent.  Because Xiao describes the AZ91D alloy as unsuitable for dissolvable magnesium composite applications, a POSITA would not accept the type and range of elements in AZ91D as being recommended for an improved dissolvable magnesium composite.  Indeed, Xiao provided a comparative example that utilized different elements at different ranges. That is what Xiao discloses to a POSITA seeking improved dissolvable magnesium composites for service in gas and oil well production.

Dr. Medlin also pervasively claims that Xiao discloses or makes obvious the specific ranges of elements in the '653 Patent and '740 Patent. In each instance, Dr. Medlin's analysis is incorrect for at least two reasons: 1) Xiao claim 2 *requires* the addition of all trace elements and does not disclose a menu from which a POSITA can select; and 2) Xiao does not disclose or make obvious the exact, full ranges claimed by the '653 Patent and '40 Patent. Dr. Medlin never makes an explanation for these deviations. For example, Medlin addresses claim 2 of the '740 Patent.  Claim 2 requires a range of nickel between 0.1% and 23.5% of the magnesium composite.  Dr. Medlin notes that claim 2 of Xiao discloses a range of 0.05% to 5% nickel, and that Example 7 of Xiao discloses 0.5 wt. % nickel.  The limited range of nickel described in Xiao does NOT disclose the FULL range of nickel that the '740 Patent claims in claim 2.  There is nothing in  Xiao to suggest that up to 23.5 wt. % nickel in a magnesium composite could produce a useful dissolvable magnesium composite, so this limitation is NOT disclosed by Xiao.   Further, the nickel concentration disclosed in claim 2 of Xiao is disclosed in the context of that nickel necessarily being accompanied by copper in the range of 0.05% to 5%, iron in the range of 0.1% to 5%, and zirconium in the range of 0.05% to 0.5%.  There is no indication in claim 2 of Xiao, or in the seven Examples, that nickel **alone** in the range of 0.05% to 23.5% without the accompanying copper, iron and zirconium can be used to produce a useful dissolvable magnesium composite. The additive material from Xiao claim 2 must be 0.5 wt. % Ni + 0.5 wt. % Cu + 0.1 wt. % Fe + 0.05 wt. % Zr, totaling a floor of 1.15 wt. % additive material, and 5 wt. % Ni + 5 wt. % Cu + 5 wt. % Fe + 0.5 wt. % Zr, totaling a ceiling of 15.5 wt. %, contrary to Dr. Medlin's claim regarding the additive amount range in '653 Patent claim 1.

This same explanation defeats Dr. Medlin's claims that Xiao discloses any singular element added to magnesium or that the additive material can constitute only 0.05% of the mixture. Additionally, Xiao never discloses or makes obvious a range for zirconium or manganese—Dr. Medlin relies on AZ91D, which Xiao specifically seeks to overcome, to fill in this gap. Because Dr. Medlin applies no analysis of obviousness, each of Dr. Medlin's opinions on the use of particular elements at particular ranges are unsupported and irrelevant.

Dr. Medlin also claims that Xiao discloses a dissolution rate ranging from 5-325 mg/cm$^2$/hr at 3 wt. % KCl water when Xiao only discloses dissolution rates of 15-36 mg/cm$^2$/hr at 70°C in 3% KCl solution and 36-74 mg/cm$^2$/hr at 93°C in 3% KCl solution. By Dr. Medlin's own analysis,

Xiao does not disclose the full range claimed by the '653 Patent and '740 Patent. Dr. Medlin applies no analysis and makes no explanation for this significant derivation, nor does Dr. Medlin rationalize how a POSITA would attain this fuller range based on Xiao or why a POSITA would have understood Xiao's disclosure "as a floor." Xiao does not disclose or make obvious this required range in the '653 Patent and '740 Patent and Dr. Medlin's opinion to the contrary is unsupported.

Dr. Medlin's opinion that Xiao discloses heat treatment to improve hardness is incorrect. Dr. Medlin claims that a U.S. Patent discussed as prior art within Xiao discloses sintering, which should lead a POSITA to the heat treatment to improve surface hardness required by the '653 claim 8. Importantly, Ecometal and Dr. Medlin do not assert this referenced U.S. Patent as prior art invalidating the '653 Patent. Xiao itself does not discuss, explain, improve upon, or disclose heat treatment to improve surface hardness. Xiao actually teaches away from heat treatment because, just two sentences later in Xiao's specification, Xiao provides: "However, the above method requires plating … which would greatly increase the production of the material and thus cannot be industrially produced." Xiao does not disclose or make obvious this claim limitation of the '653 Patent.

Despite the '653 Patent and the '740 Patent explicitly describing the production process, Dr. Medlin claims that a POSITA could have reached that exact production process back in April 2014. Dr. Medlin claimed that in April 2014 a POSITA could have determined that the additive material had a greater melting point temperature than a solidus temperature of the magnesium based on being able to calculate basic melting points in phase diagrams. Dr. Medlin continued to state that, based on being able to do basic calculations, a POSITA could have learned to add the materials in the sequence and under the conditions that the '653 Patent and '740 Patent require. The problem with Dr. Medlin's analysis is that it is unexplained hindsight opinion. Tellingly, Dr. Medlin only claims what a POSITA *could* do—not what Xiao would have led the POSITA to do. This type of expert opinion is insufficient to disclose or make obvious this claim limitation.

Had Dr. Medlin conducted a complete obviousness analysis, he would have discovered that there was a long-felt need for a higher strength dissolvable oil and gas fracking tool to overcome the limitations of the polymeric tools requiring mechanical removal, and the tools made via powder-metallurgy which were deficient in strength prior to dissolution. He would have found that fracking in the oil and gas exploration and development industry has existed for many decades, and the major oil companies and their servicing suppliers such as Halliburton and Schlumberger would have long ago created the magnesium composites such as those described in the '653 Patent if they were obvious. Dr. Medlin would also have learned of the great commercial success for the patented products, as shown by the rapid expansion of the business and the ability to command premium prices in the marketplace, until copying of the patented magnesium composites occurred, which is all detailed in Mr. Andrew Sherman's April 29, 2020 declaration. Mr. Sherman also testified in his declaration about specific documents and information that specifically established long-felt need of this invention in the fracking industry, and praise by others once his team invented their dissolvable magnesium. (Sherman Declaration at 17-27.) For example, Mr. Sherman and his

team received a number of recognitions for their invention. (Sherman Declaration at 21.) Again, Dr. Medlin never addressed this non-obviousness factor, let alone facts that strongly show it supporting non-obviousness.

In summary, it is my opinion based on the analysis presented above that Xiao does not anticipate any of the asserted claims of the '653 Patent or the '740 Patent, including claim 1, 4, 5, 8, 11, 13, 25, 29, 33, 37, 41, 43, 45, 49, 55, 69, 70, 71, 73, or 74 of the '653 Patent or claims 2, 19, or 94 of the '740 Patent as asserted by Dr. Medlin.

### B. Dr. Medlin's Analysis of Xiao in view of Hassan Cannot Support Anticipation or Obviousness

Xiao in view of Hassan does not disclose or make obvious claims 7, 12, 13, or 71 of the '653 Patent because they do not disclose or make obvious a controlled dissolvable Mg alloy, or any dissolution rates, or in situ precipitated galvanically active particles as recited in the '653 Patent claims. As described above, Xiao does not disclose or make obvious any in situ precipitated galvanically active particles as recited in the '653 Patent claims. As such, even their combination with Hassan cannot make the '653 Patent claims obvious.

Dr. Medlin has made no attempt to demonstrate a motivation to combine the Xiao and Hassan references, especially when Hassan teaches away from and describes a different art than Xiao. It is my opinion that a POSITA would not have looked from Xiao to Hassan, and combined them. Without any analysis or explanation, Dr. Medlin's analysis as to every claim limitation on this theory is unsupported and irrelevant.

Hassan teaches, to a POSITA, that elemental nickel particles can be distributed within a mass of magnesium turnings, and melted into a slurry of molten magnesium and solid nickel particles, which can then be extruded into a metal matrix composite that is reinforced by nickel particles that never melted. As such, it does not teach the intentional formation of in situ precipitates, e.g. $Mg_2Ni$.

Dr. Medlin looks to Hassan using impermissible hindsight to find a reference that mentions in passing the existence of small $Mg_2Ni$ particles, so that he can add those small $Mg_2Ni$ particles to Xiao.  The difficulty is that at the time of the invention, a POSITA would have had no motivation to look to Hassan for any improvement in the examples of Xiao.

For example, contrary to Dr. Medlin's opinion, a POSITA would not have looked from Xiao to Hassan to make obvious the deformation processing of claim 7. Hassan discloses no deformation processing to reduce grain size. Since the mechanical strength of the Xiao examples, 360 mPa to 410 mPa, overlaps the mechanical strengths of the Hassan composites, 313 mPa to 463 mPa, and both are well in excess of the non-dissolving AZ91 magnesium alloy, 232 mPa to 258 mPa, a POSITA would not look to Hassan to provide a mechanism to improve the strength of the Xiao examples, which are adequate for their intended purposes.

What Hassan does describe is summarized at the beginning of his paper:

> **1. Introduction**
> The increasing hostile service conditions that the modern
> engineering devices have to withstand have led the
> materials scientist across the globe to create new materials
> with enhanced properties when compared to the
> conventional materials. One way to improve the properties
> of conventional metallic materials is to reinforce
> them judiciously keeping the end application in mind.
> Among the reinforced metallic materials, magnesium
> based composites are becoming the strong candidates
> for lightweight structural application due to their superior
> specific mechanical properties.

The goal of Hassan was to create a metal matrix composite to withstand "increasing hostile service conditions," with only two components, the magnesium matrix and the nickel particulate reinforcing phase. Withstanding hostile service conditions would tell a POSITA that Hassan's composites are able to withstand high temperatures and corrosive environments, the two main components of hostile environments. Hassan's composites that are resistant to corrosion in "the increasing hostile environments" would not attract the attention of a POSITA looking to improve and control the rate of dissolution of a magnesium composite in hot brine.

To a POSITA, Hassan attempted to keep as much nickel as possible in elemental particle form to maximize the strengthening effect of the nickel particles. The formation of magnesium-nickel intermetallic compounds at the surface of the nickel particles, via a diffusion mechanism, aided in developing and maintaining coherence between the face-centered-cubic crystallographic structure of the nickel particles and the hexagonal-close-packed crystallographic structure of the magnesium matrix.

In fact, Hassan actually teaches away from the '653 Patent, in that it is directed at a completely different art, the art of developing strong and ductile structural alloys to take advantage of the light weight and low density of magnesium. It is my opinion, for the reasons stated above, that the asserted claims of the '653 Patent are not anticipated by Hassan, and that Hassan does not render the asserted claims of the '653 Patent invalid due to obviousness.

As noted above, the words "corrode", "corrosion", "dissolve" and "dissolution" do not appear in the Hassan publication (let alone accelerated dissolution rates, as Medlin claims), which is a very strong basis that a POSITA would not read this publication to mean that it teaches a dissolvable Mg alloy. If anything, Hassan would have been irrelevant since the binary phase diagram for the magnesium-nickel system has, since at least 1908, shown that one of the equilibrium intermetallic compounds in this system is $Mg_2Ni$. A POSITA would not need to refer to Hassan to learn that this intermetallic compound will form under the proper thermodynamic conditions.

Similarly, a POSITA would not look to the Hassan publication to find information about controlled corrosion rates of magnesium-nickel composite materials. Hassan, with its emphasis on enhanced strength and ductility for mechanical strength in hostile environments teaches away from dissolvable magnesium alloys.

Dr. Medlin also improperly applies hindsight analysis to combine Xiao and the unreacted nickel of Hassan. Because Xiao does not disclose galvanically-active in situ precipitate, the combination of Xiao and Hassan does not make in situ precipitation of galvanically-active intermetallic phases that include unreacted nickel. Dr. Medlin makes no attempt to explain why the nickel remains unreacted under Hassan such that it would also remain unreacted in any combined application with Xiao. Dr. Medlin provided no experimentation or analysis that a POSITA in April 2014 would have made the leap from Xiao's non-disclosure to Hassan's particular result of unreacted nickel to the '653 Patent. Without this explanation or experimentation, Dr. Medlin's opinion is unsupported.

For the same reasons as discussed above with respect to obviousness in light of Xiao, had Dr. Medlin conducted an actual obviousness analysis, he would have come to a different conclusion. Because I have conducted that analysis, it is my supported opinion, within a reasonable degree of scientific certainty, that Xiao in view of Hassan does not render obvious the '653 Patent claims 7, 12, 13, or 71 of the '653 Patent.


### C.     Dr. Medlin's Analysis of Fripp '035 Cannot Support Anticipation or Obviousness

Dr. Medlin's report does not support his conclusions in comparing Fripp '035 to claims 2, 19, or 94 of the '740 patent. (Medlin Report, Par. 495-533.)

Dr. Medlin's report did not address the fact that the USPTO had Fripp '035 before it as U.S. Publication No. 2014/0190705 (that was the Fripp '035 publication number), considered Fripp '035, and still allowed the claims of the '740 patent over Fripp '035. (See page 2, second column of the '740 patent.) Therefore, the USPTO reached the opposite conclusion than did Dr. Medlin – the USPTO determined that Fripp '035 does *not* anticipate or render obvious any claims in the '740 patent. Dr. Medlin's report also did not explain how or why Dr. Medlin reached such a completely different conclusion than did the USPTO.

In analyzing the full record and evidence for which Dr. Medlin's report did not do, I conclude that Fripp '035 does not anticipate or render obvious any of claims 2, 19, or 94 in the '740 patent as set forth below.

As to claim 2, Fripp '035 does *not* disclose or teach any of the following limitations: 1)"Said dissolvable magnesium composite includes in situ precipitate"; 2)"said additive material [sic] includes one or more metal materials selected from the group consisting of a) copper wherein said

copper constitutes 0.1-35 wt. % of said dissolvable magnesium composite, b) wt. % nickel wherein said nickel constitutes 0.1-23.5 wt. % of said dissolvable magnesium composite, and c) cobalt wherein said cobalt constitutes 0.1-20 wt. % of said dissolvable magnesium composite"; and 3) "said dissolvable magnesium composite has a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C."

As to claim 19, Fripp '035 does _not_ disclose or teach any of the following limitations: 1) "a mixture of magnesium or a magnesium alloy and an additive material, said additive material includes one or more metals selected from the group consisting of a) copper wherein said copper constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite, b) nickel wherein said nickel constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite, and c) cobalt wherein said cobalt constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite"; 2) "said magnesium composite includes in situ precipitate, said in situ precipitate includes said additive material, a plurality of particles of said in situ precipitate having a size of no more than 50 μm"; and 3) "said magnesium composite has a dissolution rate of at least 5 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C."

As to claim 94, Fripp '035 does _not_ disclose or teach any of the following limitations: 1) "additive material includes a) nickel wherein said nickel constitutes 0.01-5 wt. % of said dissolvable magnesium cast composite or b) nickel wherein said nickel constitutes 0.1-23.5 wt. % of said dissolvable magnesium cast composite"; 2) "dissolvable magnesium cast composite includes in situ precipitate"; 3) "in situ precipitate includes said additive material"; and 4) "said dissolvable magnesium cast composite has a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C."

### i. _Fripp '035 does not anticipate or render obvious Claim 2._

#### _"Said dissolvable magnesium composite includes in situ precipitate"_

First, Fripp '035 does not disclose or teach in any way to a POSITA "said dissolvable magnesium composite includes in situ precipitate." The only citation Dr. Medlin cites to in Fripp '035 (6:58-7:5) does not in any way disclose or teach an in situ precipitate. (Medlin Report, par. 499-500.) That citation merely identifies the fact that the "magnesium and at least one other ingredient are in a **solid solution** _and not in a partial solution or a compound where inter-granular inclusions may be present._" (Fripp '035, 6:58-60 (emphasis added).) Thus, Fripp '035 teaches a POSITA the opposite of the claimed element: do _not_ use solution where "inter-granular inclusions may be present." In contrast, the '740 patent requires in situ precipitates, which can appear in the form of granular inclusions. Because Dr. Medlin did not address the key passage in his citation that contradicts his conclusion, Dr. Medlin's conclusion is incorrect, and Fripp '035 does not disclose or teach to a POSITA this claimed element.

Further, the only phrase in this passage that Dr. Medlin address in Fripp '035 (6:58-7:5) is "solid-state solution." (Medlin Report, Par. 500.) And all Dr. Medlin states is that a POSITA "in August

2014 would have understood the disclosure of 'solid state solution' to be a reference to an in situ precipitate." (*Id.*) Dr. Medlin is making a conclusory statement with no basis to explain how or why a POSITA would understand a solid-state solution to mean just that – it is a solid-state solution – as opposed to it being an in situ precipitate.  Dr. Medlin based his analysis on what a "PHOSITA in *August 2014* would have understood the disclosure of 'solid-state solution' to be a reference to an *in situ* precipitate." (Medlin Report, par. 500.) A POSITA's understanding as of August 2014 is meaningless because Terves filed the original application for the '740 patent on April 18, 2014. Thus, under Dr. Medlin's own analysis, a POSITA would not have known that a "solid-state solution" was the same as the claimed in situ precipitate as of April 18, 2014. And without that knowledge as of that date, it would not have been obvious to a POSITA what a solid-state solution was in Fripp '035.

Even if Dr. Medlin claims that his August 2014 reference was somehow a typographical error, Dr. Medlin is still incorrect. This is because a sold-state solution cannot include an in situ precipitate. For example, the beginning of this cited passage that Dr. Medlin did not address states that the magnesium and other ingredient are "*not* in a partial solution or compound where inter-granular inclusions may be present." (Fripp '035 6:58-60.) Thus, Fripp '035 explicitly states that the combination of magnesium and at least one other ingredient "inter-granular inclusions" are not present. That is fatal to Dr. Medlin's analysis because inter-granular inclusions can be in situ precipitates. So the very section Dr. Medlin cites in Fripp '035 teaches a POSITA as of April 17, 2014 *not to include* inter-granular inclusion – which can be in situ precipitates as required in claim 2. Therefore, Dr. Medlin's sole citation in Fripp '035 contradicts his conclusion. Fripp '035 not only fails to disclose to teach a POSITA the claimed in situ precipitate, a full reading and understanding of that section – which Dr. Medlin did not provide in his report – teaches the opposite.

> *"said additive material [sic] includes one or more metal materials selected from the group consisting of a) copper wherein said copper constitutes 0.1-35 wt. % of said dissolvable magnesium composite, b) wt. % nickel wherein said nickel constitutes 0.1-23.5 wt. % of said dissolvable magnesium composite, and c) cobalt wherein said cobalt constitutes 0.1-20 wt. % of said dissolvable magnesium composite."*

Fripp '035 also does not disclose or teach to a POSITA the claimed element "said additive material [sic] includes one or more metal materials selected from the group consisting of a) copper wherein said copper constitutes 0.1-35 wt. % of said dissolvable magnesium composite, b) wt. % nickel wherein said nickel constitutes 0.1-23.5 wt. % of said dissolvable magnesium composite, and c) cobalt wherein said cobalt constitutes 0.1-20 wt. % of said dissolvable magnesium composite." As Dr. Medlin's report states there can be no anticipation if Fripp '035 does not disclose one or more claimed elements (Medlin report, Par. 29.) Dr. Medlin's report spends only three short paragraphs on this claimed element. (Medlin report, Par. 506-508.) Dr. Medlin's analysis shows that he did not establish anticipation because he literally did not cite to anything in Fripp '035 that discloses any of the weight %'s identified in this claimed element such as 0.1-35% copper, 0.1-23.5% nickel, and 0.1-20% cobalt in combination with each other. Dr. Medlin also did not include in his report

any inherency analysis. (*Id.*) Dr. Medlin's report, however, does state that for inherency "that a certain result or characteristic may occur or be present in the prior art is <u>not</u> enough; that a certain result or characteristic must always occur (or be present) for the result or characteristic to be implicit or inherently disclosed (Medline report, Par. 32.) That is the case here: there is nothing in Fripp '035, and Dr. Medlin certainly did not cite to anything in that reference, that requires the "certain result or characteristic must always occur" namely that the cobalt, nickel, and copper must be used and done so in specific weight % ranges as recited in claim 2. Therefore, Fripp '035 cannot anticipate claim 2.

Dr. Medlin's conclusory opinion also does not support his obviousness conclusion for this claimed element. There are two passages in Fripp '035 that contradict Dr. Medlin's conclusory opinion, and Dr. Medlin's report did not address either of them (Medlin report, Par.  506-508.) In the first passage, Fripp '035 identifies at least 51 different metals or materials to add to magnesium, but does not in any way prioritize cobalt, nickel, or copper over any of the other metals or materials. (Fripp 6:34-44.) In fact, Medlin cited approvingly to this passage with the 51 different metals or materials in paragraph 501 of this report, but then did not address how or why it would have been obvious from that long list to identify the three specifically recited in this claimed element. In the second passage, Fripp '035 specifically identifies 22 of the 51 metals "[p]referably" chosen. (Fripp '035 6:44-50.) Dispositively, that "preferably" passage *does not identify* cobalt as one of the 22 preferred metals chosen. (*Id.*) Thus, it would <u>not</u> have been obvious to a POSITA to have specifically chosen nickel, cobalt and copper together as recited in this claimed element based on Fripp '035. And, again, Dr. Medlin did not address this second passage or the fact that it contradicts his conclusory opinion. (Medlin report, Par.  506-508.)

Finally, Dr. Medlin ends this section stating that "Xiao [not Fripp '035] discloses or makes obvious all of the limitations of this claim element." (Medlin report, Par.  508.) This sentence is incorrect because this section discusses Fripp '035 and not Xiao. Therefore, this incorrect third of three short paragraphs in this section also does not support Dr. Medlin's conclusions.

> *"said dissolvable magnesium composite has a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C"*

Fripp '035 does not in any way disclose or teach the "dissolvable magnesium composite ha[ving] a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C" as recited in claim 2. Dr. Medlin's short four paragraph discussion does not show how or why Fripp '035 discloses or teaches to a POSITA this claimed element. (Medlin Report, Par. 508-512.) The only citation in Dr. Medlin's report is Fripp '035 8:39-47, which states that the metal alloy can dissolve "in the range from about 1 hour to about 2 months, preferably about 5 to about 10 days." (Medlin report, par. 510.) First, this citation in Fripp '035 in no way discloses the claimed dissolution rate of at least 75 mg/cm2/hr. In fact, a dissolution that takes 5 days, 10 days, or an entire month as taught by Fripp '035 is much lower than the claimed at least 75 mg/cm2/hr. And Dr. Medlin provided no conversion analysis to convert the 1 hour to about 2 months or preferably 5-10 days

into a dissolution rate let alone the claimed dissolution rate. Therefore, Fripp '035 does not in any way disclose or teach a POSITA a magnesium composite having the claimed dissolution rate.

Further, Dr. Medlin's report does not identify how or where Fripp '035 discloses 3 wt. % KCl water mixture at 90° C. That is because Fripp '035 does not in any way disclose using this concentration potassium chloride or doing so at this temperature. This is critical because it is unknown what or how fast or slow the dissolution rate is for a metal alloy in Fripp '035, let alone developing a metal alloy with the dissolution rate recited in claim 2. Again, Fripp '035 does not in any way disclose or teach this claimed element either. Therefore, Fripp '035 does not disclose or teach a POSITA a magnesium composite having a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C" as recited in claim 2.

### ii. _Fripp '035 does not render Claim 19 obvious._

Dr. Medlin only asserts obviousness, and not anticipation against claim 19 for the '740 patent based on Fripp '035. (Medlin report, 513.) For at least the reasons below, claim 19 would not have been obvious based on Fripp '035.

> _"a mixture of magnesium or a magnesium alloy and an additive material, said additive material includes one or more metals selected from the group consisting of a) copper wherein said copper constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite, b) nickel wherein said nickel constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite, and c) cobalt wherein said cobalt constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite"_

Fripp '035 does not disclose or teach to a POSITA the claimed element "a mixture of magnesium or a magnesium alloy and an additive material, said additive material includes one or more metals selected from the group consisting of a) copper wherein said copper constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite, b) nickel wherein said nickel constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite, and c) cobalt wherein said cobalt constitutes at least 0.01 wt. % of said dissolvable magnesium cast composite." Dr. Medlin's report spends only two short paragraphs on this claimed element. (Medlin report, Par. 514-515.) Dr. Medlin's analysis that he did not establish obviousness because he did not cite to anything in Fripp '035 that discloses or teaches any of the weight %'s identified in this claimed element. (_Id._)

There are two passages in Fripp '035 that contradict Dr. Medlin's conclusory opinion, and Dr. Medlin's report did not address either of them (Medlin report, Par. 514-15.) In the first passage, Fripp '035 identifies at least 51 different metals or materials to add to magnesium, but does not in any way prioritize cobalt, nickel, or copper over any of the other metals or materials. (Fripp 6:34-44.) In fact, Medlin cited approvingly to this passage with the 51 different metals or materials in paragraph 501 of this report, but then did not address how or why it would have been obvious from that long list to identify the three specifically recited in this claimed element. In the second passage,

Fripp '035 specifically identifies 22 of the 51 metals "[p]referably" chosen. (Fripp '035 6:44-50.) Dispositively, that "preferably" passage *does not identify* cobalt as one of the 22 preferred metals chosen. (*Id.*) Thus, it would *not* have been obvious to a POSITA to have specifically chosen nickel, cobalt and copper together as recited in this claimed element based on Fripp '035. And, again, Dr. Medlin did not address this second passage or the fact that it contradicts his conclusory opinion. (Medlin report, Par.  514-15.)

> *"said magnesium composite includes in situ precipitate, said in situ precipitate includes said additive material, a plurality of particles of said in situ precipitate having a size of no more than 50 µm"*

First, Fripp '035 does not disclose or teach in any way to a POSITA an "in situ precipitate," an in situ precipitate that "includes said additive material," or where the "plurality of particles in said in situ precipitate having a size of no more than 50 µm." The only citation in Fripp '035 Dr. Medlin cites is Fripp '035 6:58-7:5 which shows that Fripp '035 does not in any way disclose or teach an in situ precipitate, a precipitate made from an additive material, or having a plurality of particles with a size of no more than 50 µm. (Medlin Report, par. 516-517.) That citation merely identifies the fact that the "magnesium and at least one other ingredient are in a solid solution *and not in a partial solution or a compound where inter-granular inclusions may be present.*" (Fripp '035, 6:58-60 (emphasis added).) Thus, Fripp '035 teaches a POSITA the opposite of the claimed element: do *not* use solution where "inter-granular inclusions may be present." In contrast, the '740 patent requires in situ precipitates, which can appear in the form of granular inclusions. Because Dr. Medlin did not address the key passage in his citation that contradicts his conclusion, Dr. Medlin's conclusion is incorrect, and Fripp '035 does not disclose or teach to a POSITA this claimed element.

Further, Dr. Medlin gives no explanation whatsoever where any of the language in the claimed element is found in this cited passage. (Medlin Report, Par. 516-17.) That section is completely silent on using an in situ precipitate, having a precipitate based on an additive material, or having the plurality of those particles of said in situ precipitate having a particular size. It would not have been obvious to a POSITA what a solid-state solution was in Fripp '035.

A sold state solution (a single phase) cannot contain an in situ precipitate (which would be a second distinct phase). For example, the beginning of this cited passage that Dr. Medlin did not address states that the magnesium and other ingredient are "*not* in a partial solution or compound where inter-granular inclusions may be present." (Fripp '035 6:58-60.) Thus, Fripp '035 explicitly states that the combination of magnesium and at least one other ingredient "inter-granular inclusions" are not present. That is fatal to Dr. Medlin's analysis because "inter-granular inclusion" is a broad category that includes in-situ precipitates. So the very section Dr. Medlin cites in Fripp '035 teaches a POSITA as of April 17, 2014 *not to include* inter-granular inclusion – which can be in situ precipitates as required in claim 2. Therefore, Dr. Medlin's sole citation in Fripp '035 contradicts his conclusion. Fripp '035 not only fails to disclose to teach a POSITA the claimed in

situ precipitate, a full reading and understand of that section – which Dr. Medlin did not provide in his report – teaches the opposite.

> *"said magnesium composite has a dissolution rate of at least 5 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C"*

Fripp '035 does not in any way disclose or teach the "dissolvable magnesium composite ha[ving] a dissolution rate of at least 5 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C" as recited in claim 19. Dr. Medlin's discussion does not show how or why Fripp '035 discloses or teaches to a POSITA this claimed element. (Medlin Report, Par. 518-521.)

The only citation in Dr. Medlin's report is Fripp '035 8:39-47, which states that the metal alloy can dissolve "in the range from about 1 hour to about 2 months, preferably about 5 to about 10 days." (Medlin report, par. 519.) Dr. Medlin provided no conversion analysis to convert the 1 hour to about 2 months or preferably 5-10 days into a dissolution rate let alone the claimed dissolution rate. Therefore, Fripp '035 does not in any way disclose or teach a POSITA a magnesium composite having the claimed dissolution rate.

Further, Dr. Medlin's report does not identify how or where Fripp '035 discloses 3 wt. % KCl water mixture at 90° C. That is because Fripp '035 does not in any way disclose using this concentration potassium chloride or doing so at this temperature. This is critical because it is unknown what or how fast or slow the dissolution rate is for a metal alloy in Fripp '035, let alone developing a metal alloy with the dissolution rate recited in claim 2. Again, Fripp '035 does not in any way disclose or teach this claimed element either.

Therefore, Fripp '035 does not disclose or teach a POSITA a magnesium composite having a dissolution rate of at least 5 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C" as recited in claim 19.

### iii.    *Fripp '035 does not anticipate or render obvious Claim 94.*

> *"additive material includes a) nickel wherein said nickel constitutes 0.01-5 wt. % of said dissolvable magnesium cast composite or b) nickel wherein said nickel constitutes 0.1-23.5 wt. % of said dissolvable magnesium cast composite"*

Fripp '035 also does not disclose or teach to a POSITA the claimed element "said additive material [sic] includes one or more metal materials selected from the group consisting of a) copper wherein said copper constitutes 0.1-35 wt. % of said dissolvable magnesium composite, b) wt. % nickel wherein said nickel constitutes 0.1-23.5 wt. % of said dissolvable magnesium composite, and c) cobalt wherein said cobalt constitutes 0.1-20 wt. % of said dissolvable magnesium composite." As Dr. Medlin's report states there can be no anticipation if Fripp '035 does not disclose one or more claimed elements (Medlin report, Par. 29.) Dr. Medlin's report spends only three short paragraphs on this claimed element. (Medlin report, Par. 506-508.) Dr. Medlin's analysis that he did not establish anticipation because he literally did not cite to anything in Fripp '035 that discloses any

of the weight %'s identified in this claimed element such as 0.1-35% copper, 0.1-23.5% nickel, and 0.1-20% cobalt in combination with each other. Dr. Medlin also did not include in his report any inherency analysis. (*Id.*) Dr. Medlin's report, however, does state that for inherency "that a certain result or characteristic may occur or be present in the prior art is <u>not</u> enough; that a certain result or characteristic must always occur (or be present) for the result or characteristic to be implicit or inherently disclosed (Medline report, Par. 32.) That is the case here: there is nothing in Fripp '035, and Dr. Medlin certainly did not cite to anything in that reference, that requires the "certain result or characteristic must always occur" namely that the cobalt, nickel, and copper must be used and done so in specific weight % ranges as recited in claim 2. Therefore, Fripp '035 cannot anticipate claim 2.

Dr. Medlin's conclusory opinion also does not support his obviousness conclusion for this claimed element. There are two passages in Fripp '035 that contradict Dr. Medlin's conclusory opinion, and Dr. Medlin's report did not address either of them (Medlin report, Par. 506-508.) In the first passage, Fripp '035 identifies at least 51 different metals or materials to add to magnesium, but does not in any way prioritize cobalt, nickel, or copper over any of the other metals or materials. (Fripp 6:34-44.) In fact, Medlin cited approvingly to this passage with the 51 different metals or materials in paragraph 501 of this report, but then did not address how or why it would have been obvious from that long list to identify the three specifically recited in this claimed element. In the second passage, Fripp '035 specifically identifies 22 of the 51 metals "[p]referably" chosen. (Fripp '035 6:44-50.) Dispositively, that "preferably" passage *does not identify* cobalt as one of the 22 preferred metals chosen. (*Id.*) Thus, it would <u>*not*</u> have been obvious to a POSITA to have specifically chosen nickel, cobalt and copper together as recited in this claimed element based on Fripp '035. And, again, Dr. Medlin did not address this second passage or the fact that it contradicts his conclusory opinion. (Medlin report, Par. 506-508.)

Finally, Dr. Medlin ends this section stating that "Xiao [not Fripp '035] discloses or makes obvious all of the limitations of this claim element." (Medlin report, Par. 508.) This sentence is incorrect because this section discusses Fripp '035 and not Xiao. Therefore, this incorrect third of three short paragraphs in this section also does not support Dr. Medlin's conclusions.

<u>*"dissolvable magnesium cast composite includes in situ precipitate"*</u>

First, Fripp '035 does not disclose or teach in any way to a POSITA "Said dissolvable magnesium composite includes in situ precipitate." The only citation Dr. Medlin cites to in Fripp '035 (6:58-7:5.) does not in any way disclose or teach an in situ precipitate. (Medlin Report, par. 499-500.) That citation merely identifies the fact that the "magnesium and at least one other ingredient are in a solid solution *and not in a partial solution or a compound where inter-granular inclusions may be present.*" (Fripp '035, 6:58-60 (emphasis added).) Thus, Fripp '035 teaches a POSITA the opposite of the claimed element: do <u>*not*</u> use solution where "inter-granular inclusions may be present." In contrast, the '740 patent requires in situ precipitates, which can appear in the form of granular inclusions. Because Dr. Medlin did not address the key passage in his citation that

contradicts his conclusion, Dr. Medlin's conclusion is incorrect, and Fripp '035 does not disclose or teach to a POSITA this claimed element.

Further, the only phrase in this passage that Dr. Medlin address in Fripp '035 (6:58-7:5) is "solid-state solution." (Medlin Report, Par. 500.) And all Dr. Medlin states is that a POSITA "in August 2014 would have understood the disclosure of 'solid state solution' to be a reference to an in situ precipitate." (*Id.*) Dr. Medlin is making a conclusory statement with no basis to explain how or why a POSITA would understand a solid-state solution to mean just that – it is a solid-state solution – as opposed it being an in situ precipitate.  Dr. Medlin based his analysis on what a "PHOSITA in *August 2014* would have understood the disclosure of 'solid-state solution' to be a reference to an *in situ* precipitate." (Medlin Report, par. 500.) A POSITA's understanding as of August 2014 is meaningless because Terves filed the original application for the '740 patent on April 18, 2014. Thus, under Dr. Medlin's own analysis, a POSITA would not have known that a "solid-state solution" was the same as the claimed in situ precipitate as of April 18, 2014. And without that knowledge as of that date, it would not have been obvious to a POSITA what a solid-state solution was in Fripp '035.

Even if Dr. Medlin claims that his August 2014 reference was somehow a typographical error, Dr. Medlin is still incorrect. This is because a sold-state solution cannot include an in situ precipitate. For example, the beginning of this cited passage that Dr. Medlin did not address states that the magnesium and other ingredient are "*not* in a partial solution or compound where inter-granular inclusions may be present." (Fripp '035 6:58-60.) Thus, Fripp '035 explicitly states that the combination of magnesium and at least one other ingredient "inter-granular inclusions" are not present. That is fatal to Dr. Medlin's analysis because inter-granular inclusions can be in situ precipitates. So the very section Dr. Medlin cites in Fripp '035 teaches a POSITA as of April 17, 2014 *not to include* inter-granular inclusion – which can be in situ precipitates as required in claim 2. Therefore, Dr. Medlin's sole citation in Fripp '035 contradicts his conclusion. Fripp '035 not only fails to disclose to teach a POSITA the claimed in situ precipitate, a full reading and understand of that section – which Dr. Medlin did not provide in his report – teaches the opposite.

*"in situ precipitate includes said additive material"*

With no inter-granular inclusions, and thus no in situ precipitates in the solid solution magnesium alloy of Fripp '035, there are no in situ precipitates disclosed.

*"said dissolvable magnesium cast composite has a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C"*

Fripp '035 does not in any way disclose or teach the "dissolvable magnesium composite ha[ving] a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C" as recited in claim 2. Dr. Medlin's short four paragraph discussion does not show how or why Fripp '035 discloses or teaches to a POSITA this claimed element. (Medlin Report, Par. 530-533.) The only citation in Dr. Medlin's report is Fripp '035 8:39-47, which states that the metal alloy can dissolve

"in the range from about 1 hour to about 2 months, preferably about 5 to about 10 days." (Medlin report, par. 531.) First, this citation in Fripp '035 in no way discloses the claimed dissolution rate of at least 75 mg/cm2/hr. In fact, a dissolution that takes 5 days, 10 days, or an entire month as taught by Fripp '035 is much lower than the claimed at least 75 mg/cm2/hr. And Dr. Medlin provided no conversion analysis to convert the 1 hour to about 2 months or preferably 5-10 days into a dissolution rate let alone the claimed dissolution rate. Therefore, Fripp '035 does not in any way disclose or teach a POSITA a magnesium composite having the claimed dissolution rate.

Further, Dr. Medlin's report does not identify how or where Fripp '035 discloses 3 wt. % KCl water mixture at 90° C. That is because Fripp '035 does not in any way disclose using this concentration potassium chloride or doing so at this temperature. This is critical because it is unknown what or how fast or slow the dissolution rate is for a metal alloy in Fripp '035, let alone developing a metal alloy with the dissolution rate recited in claim 2. Again, Fripp '035 does not in any way disclose or teach this claimed element either.

Therefore, Fripp '035 does not disclose or teach a POSITA a magnesium composite having a dissolution rate of at least 75 mg/cm2/hr. in 3 wt. % KCl water mixture at 90° C" as recited in claim 94.

In summary, it is my supported opinion that Fripp '035 does not anticipate or make obvious claims 2, 19, or 94 of the '740 patent. I hold this opinion with at least a reasonable degree of scientific and engineering certainty.

### D. Dr. Medlin's Analysis of Fripp '118 Cannot Support Anticipation or Obviousness

Fripp '118 does not anticipate or make obvious claims 1, 4, 5, 11, 13, 29, 37, 41, 43, 45, 49, 69, 70, 71, or 73 of the '653 Patent. Because Fripp '118 does not disclose even one claimed element in '653 Patent claim 1, Fripp '118 cannot anticipate the '653 Patent. Fripp '118 contains six required claim elements: 1) a magnesium composite that "includes in situ precipitation of galvanically active intermetallic phases"; 2) "additive material having a greater melting point temperature than a solidus temperature of said magnesium"; 3) said additive material constituting about 0.05 wt. %-45 wt. % of said mixture"; 4) "said additive material forming precipitant in said magnesium composite"; 5) "said additive material includes one or more metals selected from the group consisting of copper, nickel, iron, and cobalt,"; and 6) "said magnesium composite has a dissolution rate of at least 5 mg/cm2/hr. in 3 wt. % KCl water mixture at 90°C."

Dr. Medlin's report did not identify all of these required elements with respect to Fripp '118, and instead addressed only two. As to those two, Dr. Medlin does not explain how Fripp '118 discloses them. Dr. Medlin's report states that for Fripp '118 to anticipate claim 1, it must disclose each and every element in claim 1. (Medlin report, par. 29.) If Fripp '118 is silent as to one or more elements, then by definition it cannot anticipate. As set forth below, because the passages Dr. Medlin cites

to are completely silent on a POSITA comparing the temperature of the additive material versus the solidus temperature of the magnesium, Fripp '118 does not disclose this claimed element. For example, claim 1 requires the "magnesium composite has a dissolution rate of at least 5 mg/cm2/hr. in 3 wt. % KCl water mixture at 90°C." However, Fripp '118 does not disclose any such dissolution rate. In fact, Fripp '118 states the opposite:

> "The anode or the metal alloy can also dissolve after the period of time has elapsed since introduction of the isolation device into the wellbore.  The desired period of time is discussed above."  (Column 10, lines 55-58).

The "desired period of time . . .  above" is:

> "The period of time can be at least 2 days. The period of time can also be in the range of about 2 days to about 2 months or about 2 days to about 2 weeks."  (Column 10, lines 11-13)

This is much below the recited claimed element. Testing of the Terves alloys practicing the '653 patent shows that they dissolve to an extent compromising their integrity in 6 hours or less.  Thus Fripp '118 does not disclose the rapid controlled dissolution rates claimed in the '653 patent.

Thus, Fripp '118 does not disclose any of these limitations that Dr. Medlin did not address. Therefore, Fripp '118 cannot anticipate claim 1 of the '653 Patent.

Fripp '118 does not disclose in situ precipitation of galvanically active intermetallic phases. Dr. Medlin does not identify anywhere in Fripp '118 the terms "in situ precipitation" or "galvanically-active intermetallic phases" appear. Dr. Medlin merely cites to two different passages in relation to this claim element. Neither of those passages disclose this claimed element. First, Dr. Medlin cites to a sentence in Fripp '118 (4:6-8) that states that "a single metal alloy containing at least 50% magnesium can dissolve in an electrolyte without a distinct cathode being present." (Medlin report, Par. 425.) That sentence in Fripp '118 merely states that an alloy can be dissolved with a salt (i.e. an "electrolyte") without a distinct cathode present. That sentence in Fripp '118, however, does not disclose or teach in any way what the structure of the alloy is. In fact that sentence makes no mention whatsoever of: (1) any in situ precipitation, (2) of galvanically active intermetallic phases in the magnesium composite, that (3) causes dissolution.  The opposite is true: Fripp '118 provides no explanation whatsoever of how or why the alloy dissolves in an electrolyte. Dr. Medlin's report also does not address the meaning or importance of the phrase "without a distinct cathode being present" stated in Fripp '118 (4:6-8). This is because this phrase also does not disclose or teach in any way an in situ precipitation of galvanically active intermetallic phases. Therefore, this quote in Fripp '118 does not disclose this claimed element.

Second, Dr. Medlin cites to a sentence in Fripp '118 (10:51-60) that states "the metal alloy can dissolve after the period of time has elapsed since introduction of the isolation device into the wellbore. The desired period of time is discussed above. The methods can include causing or

allowing the anode and cathode to come in contact with an electrolyte." (Medlin report, Par. 426.) Again, those three sentence have nothing to do with the existence of an in situ precipitation of galvanically active intermetallic phases. Instead, those sentence merely identify that an alloy can be dissolved after a period of time once the device is introduced into the wellbore. The only thing Fripp '118 then says is that this is done by causing or allowing the anode and cathode, which can be separate components of the isolation device assembly, to come in contact with an electrolyte. This does not in any way disclose the existence in that alloy of an in situ precipitation of galvanically active intermetallic phases. Dr. Medlin's report does not address the meaning of the anode or cathode coming into contact with an electrode as identified in Fripp '118. This is because this statement in Fripp '118 does not support the disclosure in Fripp '118 of an in situ precipitation of galvanically active intermetallic phases.

Other than these two distinguishable passages, Dr. Medlin did not cite to anything in Fripp '118 that he believes discloses in situ precipitation of galvanically active intermetallic phases. That is because nothing in Fripp '118 discloses the structure of the alloys, let along that the structure of those alloys includes in situ precipitation of galvanically active intermetallic phases.

Nor does Dr. Medlin identify anywhere in Fripp '118 where it discloses the requirement of "an additive material having a greater melting point temperature than a solidus temperature of the magnesium" as set forth in claim 1 of the '653 patent. (Medlin report, Par. 430-435.) Because this is not disclosed in Fripp '118, Fripp '118 cannot anticipate claim 1 of the '653 patent.

Dr. Medlin identifies the "group" listed in Fripp '118 (7:67-8:15) as the additive materials. (Report, Par. 433.) That passage, however, is completely silent about choosing one or more of the materials in that "group" based on its melting point temperature relative to the solidus temperature of magnesium, or picking only an additive having a melting point temperature greater than the solidus temperature of magnesium. Thus, this passage is silent and does not disclose anything to a POSITA about selecting an additive material based on a melting temperature higher than the solidus temperature of magnesium.

In fact, that long listing of the "group" identifies 11 materials with melting points lower than the solidus melting point of magnesium, which is the opposite of what is disclosed in claim 1. Those include lithium, sodium, potassium, rubidium, cesium, gallium, tin, indium, thallium, zinc, and cadmium. Dr. Medlin did not mention in his report this important fact, which further shows that not only does Fripp '118 not disclose this claimed element, but it also teaches the opposite – use any of those materials as additives regardless of their melting point relative to the solidus temperature of magnesium.

Dr. Medlin then incorrectly states that Fripp '118 discloses intermediate alloys such as Al-Fe or Al-Ni, etc., in 7:67-8:15. (Medlin report, par. 432-433.) Neither that passage nor anywhere else in Fripp '118 does it disclose any of those intermediate alloys. Because Fripp '118 does not disclose in any way any of those alloys identified in Dr. Medlin's report, there is no possibility a POSITA would understand from Fripp '118: (a) to conclude to use those specific alloys or (b) to use their

phase diagrams to determine what their melting temperatures are relative to the solidus temperature of magnesium. Dr. Medlin's analysis is incorrect because he did not cite to a single instance in the Fripp '118 patent where it discloses the selection of additives that have melting temperatures greater than the solidus temperature of magnesium as stated in claim 1.

Dr. Medlin also identifies another sentence in Fripp '118 (8:11-15) that also does not disclose "an additive material having a greater melting point temperature than a solidus temperature of the magnesium" as required in claim 1 of the '653 patent. (Medlin report at par. 434.) That sentence merely identifies certain preferred materials: "the metal of the metal alloy is selected from the group consisting of aluminum, zinc, beryllium, tin, iron, nickel copper, oxides of any of the foregoing, and combinations thereof." Once again, nothing in that sentence or passage disclosing to a POSITA the selection of an additive material based on its melting point being greater than the solidus temperature of magnesium. For example, the melting point temperature of tin is _less than_ the solidus temperature of magnesium, which is the opposite of the claimed element disclosed in claim 1. Therefore, this passage also does not disclose this claimed element.

Dr. Medlin's report states that he believes Fripp '118 anticipates claims 4, 5, 11, 13, 29, 37, 41, 43, 45, 49, 69, 70, 71, and 73 of the '653 patent. (Medlin report, Par. 422.) However, out of those patent claims, Dr. Medlin only addresses "independent claim 1" with Fripp '118. (Medlin report, par. 423-435.) Dr. Medlin's report does not identify where in Fripp '118 it discloses each and every limitation recited in claims 4, 5, 11, 13, 29, 37, 41, 43, 45, 49, 69, 70, 71, and 73 of the '653 patent.

Therefore, Fripp '118 does not disclose claim 1 of the '653 Patent and Dr. Medlin's opinion is incorrect. I hold this opinion to at least a reasonable degree of scientific and engineering certainty.

## E.  Dr. Medlin's Analysis of Salnikov '022, Salnikov '292, Frack, Huitt, Oxford, and Jin

Dr. Medlin presents exactly zero analysis or application of the Salnikov '022, Salnikov '282, Frack, Huitt, Oxford, and Jin references. His opinion on these new references is unsupported and irrelevant.

## IX.  Indefiniteness Analysis

The terms of the '653 Patent and '740 Patent are all well known in the metallurgical field (including corrosion engineering and electroplating) and in the field of chemistry, and I did not see any evidence suggesting that the patent owner deviated from the ordinary meaning of those terms in the claims. As such, I find the opinions from Dr. Medlin that certain claimed terms are ambiguous to be incorrect. (See Medlin Report as to '653 Patent claims 1, 12, 25, 29, 33, 37, 41, 45, 73, and 74; and '740 Patent claims 2, 19, 82-93, 94, 102, and 103.)

Importantly, Dr. Medlin's report represents a change of his prior opinion on April 10, 2020 when he previously, specifically opined that six *different* terms were indefinite. As such, it is my opinion that Dr. Medlin has materially changed his opinion without explanation.

Here, Dr. Medlin presents that the following four terms are indefinite: A) "magnesium or a magnesium alloy"; B) "dissolution rate"; C) "subjected to deformation processing to reduce grain size of said magnesium composite, increase tensile yield strength of said magnesium composite, increase elongation of said magnesium composite, or combinations thereof"; and D) "tensile strength," "shear strength," and "elongation." These are terms that are used in metallurgy, corrosion engineering, and chemistry that persons of ordinary skill would understand.

Dr. Medlin's indefiniteness opinions apparently are based solely on Dr. Medlin's beliefs. His report does not identify any scientific literature he cites or relies upon to support his opinion. In my opinion, he underestimates the knowledge of a POSITA under even his own less restrictive definition. The concepts of chemistry, thermodynamics, and phase equilibria that Dr. Medlin's arguments question are what metallurgists and chemists learn, understand, and readily apply.  In fact, the literature which Dr. Medlin's report ignores readily shows the knowledge of these terms and how to determine the existence of an intermetallic phase, a melting point, a particle size, weight percentage, sufficient quantities, or a portion of additive material. Despite significant amounts of literature in metallurgy spanning decades of research in the field on these concepts, Dr. Medlin's failure to cite to any scientific literature showing any indefiniteness to determine an … highlights how Dr. Medlin's opinions are his own and not supported by any scientific methodology or research in the field.

### A.    "Subjected to deformation processing to reduce grain size of said magnesium composite, increase tensile yield strength of said magnesium composite, increase elongation of said magnesium composite, or combinations thereof"

Dr. Medlin includes a heading with no application of this opinion. Dr. Medlin presents no analysis, explanation, or description. His opinion on the indefiniteness of this phrase is unsupported and irrelevant.

### B.    "Magnesium or a magnesium alloy"

Dr. Medlin asserts that this claim term would be "impossible to practice" because the '653 Patent "leaves undefined what is meant by 'a magnesium alloy' and any individual would not know what magnesium' to include in the magnesium composite.'" He is incorrect. The specification makes clear that "One or more additives are added to a magnesium or magnesium alloy to form the novel magnesium composite in the present invention." A POSITA would understand "magnesium" versus "magnesium alloy." A POSITA as defined in my prior reports would have at least a bachelor's degree in chemistry, material science and engineering, metallurgy, or a related scientific

degree, and at least five years' experience in working with dissolvable metallic-based materials. A "magnesium alloy" is a mixture of magnesium with other metals, often aluminum, zinc, manganese, silicon, copper, rare earth metals, or zirconium. Dr. Medlin's opinion seriously underestimates a POSITA because a POSITA would have first learned about a "magnesium alloy" in a basic high-school science course and have significantly developed that knowledge by April 2014. Dr. Medlin's opinion also contradicts his description of a PHOSITA, which would have understood "than an 'alloy' is a metal made by combining two or more metallic elements."

I have consulted reference books and textbooks representative of those that a POSITA would have used during that person's education and professional practice, to confirm the normal understanding POSITA would have regarding this disputed claim terms.  Excerpts from those books are presented in Exhibit D, attached.  The portion of Exhibit D related to the definition of "magnesium alloy" is in complete support of my opinion that this claim term is not vague or indefinite, this claim term is understood as having its normal meaning in the art, and this claim term is not indefinite.

### C. "Dissolution rate"

Surprisingly, Dr. Medlin asserts that because "there are numerous methods of calculation dissolution rates," the term "dissolution rate" is ambiguous and both the '653 Patent and '740 Patent are indefinite. The error in Dr. Medlin's opinion is apparent—Dr. Medlin claims that there are several other dissolution rate methods that *can* be employed, not that a POSITA would have employed them. As I previously explained in my April 28, 2020 Report, I employed ASTM standard G31 which presents the standard testing method for dissolution rates. It is my opinion that a POSITA, trained in working with dissolvable metallic-based materials, would know the standard testing method for calculating dissolution rates. As such, Dr. Medlin's opinion is incorrect.

I have consulted reference books and textbooks representative of those that a POSITA would have used during that person's education and professional practice, to confirm the normal understanding POSITA would have regarding this disputed claim terms.  Excerpts from those books are presented in Exhibit D, attached.  The portion of Exhibit D related to the definition of "dissolution rate" is in complete support of my opinion that this claim term is not vague or indefinite, this claim term is understood as having its normal meaning in the art, and this claim term is not indefinite.

### D. "Tensile strength," "shear strength," and "elongation"

Dr. Medlin professes a similar opinion regarding the testing methods for "tensile strength," "shear strength," and "elongation," and, on this basis, asserts that these claim terms are indefinite. For the same reasons as I explained with respect to "dissolution rate," the absent description of a standard testing method that a POSITA would have known does not render this claim term indefinite. ASTMs express the standard testing methods that a POSITA and myself use and Dr. Medlin admits

that his ambiguity opinion "can be avoided by … simply referencing an ASTM standard." A POSITA would reference the ASTM standards as to each of these testing methods and, as such Dr. Medlin's opinion is incorrect.

I have consulted reference books and textbooks representative of those that a POSITA would have used during that person's education and professional practice, to confirm the normal understanding POSITA would have regarding this disputed claim terms. Excerpts from those books are presented in Exhibit D, attached. The portion of Exhibit D related to the definition of "tensile strength," "shear strength," and "elongation" is in complete support of my opinion that these claim terms are not vague or indefinite, these claim terms are understood as having their normal meaning in the art, and these claim terms are not indefinite.

## X. Methodology

The methodology I used to arrive at my opinions is accepted in the scientific community and is appropriate for reaching scientifically reliable conclusions such as those stated and discussed in this report. This methodology includes the following:

(1) reviewing and considering information from available sources, including documents produced by the parties, as well as other information referred to throughout this report and the exhibits thereto;

(2) informing myself regarding relevant aspects of patent law through discussions with counsel for Terves; and

(3) applying my education, training, and experience to analyze the issues I was asked to consider.

## XI. Supplementation

While the opinions set forth in this supplemental report are complete, I reserve the right to further supplement this report and any of the opinions expressed herein respectively, should I receive additional information or evidence that is relevant to those opinions between now and the time that I testify at hearing. Moreover, I reserve the right to serve one or more additional expert reports in this litigation if requested to do so, and I reserve the right to supplement the opinions set forth herein as part of such additional expert reports in order to account for additional information or evidence that is learned or developed before any such additional report is prepared.

## XII. Attestation

By affixing my signature and seal below, I certify that this report, and my five prior reports of April 28, 2020, May 4, 2020, August 6, 2020, October 6, 2020, November 20, 2020, and July 27,

2021 truthfully present the results of my analyses, and the conclusions and opinions, which I hold to at least a reasonable degree of scientific and engineering probability, that I have reached based on those analyses.  If called on to present testimony on these issues, conclusions, and opinions, I will testify completely and truthfully to my conclusions and opinions.  Subject to the penalty for perjury under United States of America laws, I declare that the foregoing is true and correct.

Respectfully submitted,

Lee A. Swanger, Ph.D., P.E.
Principal Engineer, Exponent, Inc.

Attachments:  Exhibit A, Exhibit B, Exhibit C, Exhibit D

# Exhibit A



# Exⁿponent®
Engineering & Scientific Consulting

## Lee A. Swanger, Ph.D., P.E.

Principal Engineer & Office Director  |  Materials & Corrosion Engineering
4101 Southwest 71st Ave | Miami, FL 33155
(305) 661-1000 tel  |  lswanger@exponent.com

## Professional Profile

Dr. Swanger is the Director of Exponent's Miami, Florida, office.  His consulting work centers on the application of the principles of mechanical engineering, metallurgical and materials engineering, thermodynamics, and design engineering to issues related to incidents involving performance of engineered products and systems, accident reconstruction, and failure or fracture of system components. He also consults on issues of patent infringement and patent validity in the mechanical and materials arts. More specifically, Dr. Swanger's experience includes the analysis of machinery dynamics and kinetics as exemplified by internal combustion engines of both piston and turbine configuration, as well as related compressor designs.  His materials and metallurgical experience includes alloy applications, heat treatment, electrochemistry and corrosion, welding and brazing, and materials testing.   He applies his combined expertise in both mechanical engineering and materials/metallurgical engineering to issues of fatigue and fracture, and mechanical joining via threaded fasteners.

Applications of these disciplines include systems in nuclear and fossil power plants, components of transportation systems on land, sea, and air, industrial manufacturing processes, components of commercial and residential buildings, materials used in the petroleum and chemical industries, machinery and processes for vapor degreasing and dry cleaning, and consumer products including sports equipment and kitchen appliances.

Dr. Swanger has a particular interest in engine design and performance, with an emphasis on combustion, operational stresses, lubrication and bearing design and performance.   He received a U.S. Patent for his engine bearing material and fabrication process.

## Academic Credentials & Professional Honors

Ph.D., Materials Science and Engineering, Stanford University, *with distinction*, 1972

M.B.A., Marketing/Finance, Cleveland State University, 1982

M.S., Materials Science and Engineering, Stanford University, 1969

B.S., Metallurgy, Case Institute of Technology, *with highest honors*, 1968

Hertz Foundation Graduate Fellowship, 1970-1972

Member, Board of Directors of the Fannie and John Hertz Foundation

## Licenses and Certifications

Licensed Professional Engineer, Alabama, #29848-E

Licensed Professional Mechanical Engineer, California, #M23275

Licensed Professional Engineer, Florida, #37207

Licensed Professional Engineer, Georgia, #PE036205

Licensed Metallurgical Engineer, Louisiana, #34064

Licensed Professional Engineer, Mississippi, #25349

Licensed Professional Engineer, New York, #93691

Licensed Professional Metallurgical Engineer, Ohio, #44024

Licensed Professional Engineer, Virginia, #15492

Licensed Mechanical Engineer, Wyoming, #11899

## Prior Experience

Adjunct Professor, Mechanical Engineering Department, University of Miami, 1999-2008

Director of Research and Development, Engine Parts Division, Imperial Clevite, 1979-1983

Lecturer, Mechanical Engineering Department, Cleveland State University, 1978-1982

Project Manager, Gould Labs for Materials Research, Gould Inc., 1975-1979

Associate Sr. Research Metallurgist, General Motors Research Labs, 1973-1975

## Patents

Patent 4,333,215: Bearing Material and Method of Making, issued June 8, 1982.

## Publications

Rogers G, Swanger L, Wells C. The Role of testing programs in verifying structural integrity of medium speed diesel generator components. Institute for Electrical and Electronics Engineers Transaction on Nuclear Science 1985; NS-32(1), February.

Swanger L. Inhomogeneous thermodynamics and spinodal decomposition. Ph.D. Dissertation, Stanford University, August 1972.

Swanger L, Rhines W. On the necessary conditions for homogeneous nucleation of gas bubbles in liquids. Journal of Crystal Growth 1972; 12:323-326.

Barnett D, Swanger L. The elastic energy of a straight dislocation in an infinite anistropic elastic medium. Physica Status Solidi (B) 1971; 48:419-428, 1971.

Swanger L, Cooper A, Gupta P. Computer simulation of one-dimensional spinodal decomposition. Acta

Lee Swanger, Ph.D., P.E.
09/19  |  Page 2

Metallurgica 1970; 18:9-14.

**Presentations**

Swanger L. Expert witnesses in patent infringement litigation. Presented to Cleveland Ad-Hoc Patent Litigators Council, Cleveland, OH, December 2004.

Swanger L. Early assessment of product liability claims, the role of the engineering consultant. Presented to TriMas Litigation Conference, Detroit, MI, June 2002.

Swanger L. How to solve your bearings' problems. Presented at Joint Emergency Diesel Generator Owners Group Conference, Chicago, IL, June 1997.

Swanger L, Vogler M, Rau S. Investigation of the reliability of solid aluminum main bearings in emergency diesel generators. 9th International Conference on Structural Mechanics in Reactor Technology, Volume D, Lausanne, Switzerland, August 1987.

Johnston P, Shusto L, Swanger L. Analysis of diesel engine crankshaft torsional vibrations. 9th International Conference on Structural Mechanics in Reactor Technology, Volume D, Lausanne, Switzerland, August 1987.

Swanger L. Advanced techniques of accident investigation. Presented at Occupational Safety and Health Administration Training Institute, Des Plaines, IL, March, June, and September 1986.

Swanger L, Harris D, Johnston P, Derbalian G. Advanced methods for diesel component life prediction. Society for Automotive Engineers Paper 860885, Marine Propulsion Technology Conference, Washington, DC, May 1986.

McCarthy R, McCarthy G, Swanger L. Reliability and service life of steel truck wheels. Annual Reliability and Maintainability Symposium, Las Vegas, NV, January 1986.

Rogers G, Wells C, Swanger L. Design analysis of emergency diesel generator components to establish reliability under operating conditions. 8th International Conference on Structural Mechanics in Reactor Technology, Brussels, Belgium, August 1985.

Swanger L. Bearing materials update. Presented to Society of Automotive Engineers Off-Highway Conference, Milwaukee, WI, September 1981.

Swanger L. Developments in bearings and pistons. Presented at O Motor no Futuro (The Engine of the Future), Sao Paulo, Brazil, September 1980.

Swanger L. Selection of crankshaft materials for optimum bearing performance. Presented to Society of Manufacturing Engineers Conference, CM80-392, Los Angeles, CA, June 1980.

Swanger L. Heavy duty bearings: Materials and process. Presented at Carnegie-Mellon University, Pittsburgh, PA, March 1980.

**Reports**

Swanger L. Rule 26 Report of Lee A. Swanger In the Matter of Darrell W. Hartman v. Caterpillar Inc., et. al., May 28, 2010.

Swanger L. Rule 26 Report of Lee A. Swanger In the Matter of Innovative Fuel Products, LLC vs. BP Products North America Inc., December 23, 2010.

Swanger L. Report of Lee A. Swanger In the Matter of Questar Gas Management Co. v. Waukesha and Stewart & Stevenson, March 13, 2009.

Swanger L. Expert Report of Lee A. Swanger, Ph.D. P.E. Regarding Invalidity of U.S. Patent No. 6,979,117 and U.S. Patent No. 7, 281,842, K-TEC, Inc. vs. Vita-Mix Corporation, January 15, 2010.

Swanger L. Expert Report on Patent Infringement Pursuant to Rule 26(A)(2)(B) by Lee A. Swanger, Ph.D., P.E., Vita-Mix Corporation vs. Basic Holding, Inc., Focus Products Group, LLC, Focus Electrics, LLC, and West Bend Housewares, LLC, December 17, 2007.

Swanger L. Expert Report on Rebuttal of "Expert Report of Majid Rashidi, Ph.D., P.E." Dec. 17, 2007 Regarding the Invalidity of U.S. Patent No. 5,302,021 and "Expert Report of Thomas F. Smegal, Jr." Dec. 13, 2007 Regarding Inequitable Conduct During Prosecution of U. S. Patent No. 5,302,021, Pursuant To Rule 26(A)(2)(B) by Lee A. Swanger, Ph.D., P.E., Vita-Mix Corporation vs. Basic Holding, Inc. f/k/a Back to Basics Products, Inc., Focus Products Group, LLC, Focus Electrics, LLC, and West Bend Housewares, LLC, January 7, 2008.

Swanger L. Rule 26 Report of Lee A. Swanger In the Matter of Horton, Inc. v. NSK Corporation, Inc., American Arbitration Association Case No. 65 181 Y 00320 05, October 9, 2006.

Swanger L. Report of Lee A. Swanger In the Matter of Lloyd Cunningham v. Henry Repeating Arms Co. et.al. pursuant to Federal Rule 26, July 28, 2006.

Swanger L. Expert Report on Patent Infringement Pursuant To Rule 26(A)(2)(B) by Lee A. Swanger, Ph.D., P.E., Fellowes, Inc. vs. Michilin Prosperity Company Ltd. & Intek America, Inc., January 26, 2007.

Swanger L. Expert Report on Rebuttal of January 26, 2007 "Expert Report of Elliot L. Stern, Ph.D., On The Invalidity of U.S. Patent Nos. 6,260,780 And 7,040,559" Pursuant To Rule 26(A)(2)(B) by Lee A. Swanger, Ph.D., P.E., Fellowes, Inc. vs. Michilin Prosperity Company Ltd. & Intek America, Inc., February 26, 2007.

Swanger L. Report of Lee A. Swanger Responsive to Judge Tarnow's Order of June 5, 2006, James W. Jaikins v. Caterpillar, Inc., Case No. 04-73404, December 3, 2006.

Swanger L. Bearing and Valve Investigation, Wartsila 18V46 - DG-02, Central Electrica Talnique, El Salvador, Prepared for: Inversiones Energéticas S.A. de C.V., September 22, 2009.

Swanger L. Hydrodynamic Crankshaft Bearings in Nordberg Emergency Diesel Generators, Prepared for Engineering Staff, Brunswick Nuclear Plant, Progress Energy, Southport, NC, February 17, 2011.

Swanger L. Rule 26 Report of Lee A. Swanger In the Matter of Douglas P. DeMasi v. United States of America, Case No. 3:09-cv-868-J-32JRK, October 14, 2010.

Swanger L. Response to Expert Report of Michael Thuma Pursuant to Rule 26(A)(2)(B) By Lee A. Swanger, Ph.D., P.E., Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions vs. Homeland Housewares, LLC, et al., Case No. 3:09-CV-00791 REP, October 18, 2010.

Swanger L, McDaniel D. Nordberg ductile iron piston evaluation. Prepared for Progress Energy Brunswick Nuclear Station, January 5, 2006.

Swanger L. Report of Lee A. Swanger, Ph.D., P.E. In the Matter of Verve L.L.C. v Crane Cams, et. al. Reference U.S. Patent 4,850,315, January 24, 2005.

Swanger L. Report of Lee A. Swanger In the Matter of Vine Street, L.L.C. v. James R. Keeling et. al. Rule 26 report regarding Perchloroethylene Dry Cleaning machine function, Eastern District of Texas,

September 10, 2004.

Swanger L. Declaration of Lee A. Swanger, Ph.D., P.E. re: U.S. Patent 6,071,062. PODS, Inc. v. Porta Stor, Inc. et. al., September 9, 2004.

Swanger L. Declaration of Lee A. Swanger, Ph.D., P.E. in Opposition to Plaintiffs' Motion for Preliminary Injunction. Honeywell International Inc., et. al. v. ABB Inc., et. al., reference U.S. Patent 5,193,989, May 19, 2003.

Swanger L. Report of Lee A. Swanger, Ph.D., P.E. In the Matter of Air Turbine Technology v. Atlas Copco. Reference U.S. Patent 5,439,346, November 21, 2002.

Swanger L. Report of Lee A. Swanger, Ph.D., P.E. In the Matter of Marshalltown Trowel v. Lowe's re U.S. Patent 5,615,445. March 20, 2001.

Swanger L. Declaration of Lee A. Swanger, Ph.D., P.E. In the Matter of Monte J. Solazzi, et. al. v. Premier Lab Supply, Inc. et. al. Reference U.S. Patents 5,451,375 and 5.630,989, July 20, 2000.

Swanger L, Davy R, Eberly P, Waters L. Teledyne continental camshaft and lifter performance: The influence of lubricating oil on surface conditions. Technical Report to Special Masters in Gross v. Mobil, November 1996.

Johnston P, Shusto L, Swanger L. Evaluation of diesel generator Number 1 at Brunswick Nuclear Plant. Failure Analysis Associates, Inc., Technical Report, January 1993.

Swanger L. Investigation of repeated Number 5 main bearing degradation by flashing, Fairbanks Morse opposed piston auxiliary diesel on the Emory S. Land. Failure Analysis Associates, Inc., Technical Report, January 1992.

Scheibe R, Kadlec R, Swanger L, Littmann W, Clark R, Johnston P, Hayes D. Generator Bearing condition assessment: Unit DG-1, WPPSS WNP-2. Failure Analysis Associates, Inc., Technical Report, June 1991.

Swanger L, Mercaldi D, Bisbee L, Booth A, Vetter J. DC Motor Control Center 2PB-1 Fire at Fermi II Nuclear Plant. Failure Analysis Associates, Inc., Technical Report, March 1987.

Swanger L, Webb W, Bisbee, L. Failure Investigation of North Hot Reheat Line, Detroit Edison Monroe Unit #1. Failure Analysis Associates, Inc., Technical Report, September 1986.

Swanger L, Vogler M. Investigation of surface scoring of main bearings: Fairbanks Morse 38TD8-1/8 diesels at Fermi II Power Plant. Failure Analysis Associates, Inc., Technical Report, June 1986.

Swanger L. Design review of connecting rod bearing shells for Transamerica Delaval Enterprise Engines. Failure Analysis Associates, Inc., Technical Report, March 1984.

Swanger L, Bisbee L, Webb W. Evaluation of piston and bearing from the Baltimore Gas and Electric Hunt Valley Inn cogeneration system. Failure Analysis Associates, Inc., Technical Report, June 1992.

Swanger L. Review of performance problems, Occidental Chemical M/V Julius Hammer and M/V Frances Hammer, Colt-Pielstick, PC 2.5 diesel engines. Failure Analysis Associates Report, April 1986.

Exhibit B

Complaint, Case No. 1:19-cv-1611-DCN

U.S. Patent 9,903,010

U.S. Patent 10,329,653

U.S. Patent 10,689,740

Protective Order, Case No. 1:19-cv-1611-DCN

Ecometal answers to Interrogatories

Ecometal and Yuan Preliminary Claim Constructions and Evidence

Terves' Preliminary Claim Constructions and Evidence

Declaration of Dr. Dana J. Medlin, Ph.D., P.E., FASM Addressing Proposed Claim Terms to be Construed and Proposed Constructions

Declaration of Andrew Sherman

Hawke et al., "Corrosion Properties of New Magnesium Alloys" SAE International Paper 930751 (1993)

Hanawalt et al., "Corrosion Studies of Magnesium and its Alloys" AIME Metals Technology, Technical Paper 1353 (1941)

Zhang et al., "Effect of Boron on the Grain Refinement and Mechanical Properties of as-Cast Mg Alloy AM50" Materials, (2019, 12,1100)

ASTM G31: Standard Practice for Laboratory Immersion Corrosion Testing of Metals

ASM Metals Handbook (1948)

ASM Metals Handbook, Tenth Edition, Volume 3 "Alloy Phase Diagrams" (1993)

Magnesium composite billets from Ecometal:
> AJM006, AJM010, AJM 012, AJM016, AJM017, AJM018, AJM023, MD-CAST, MM3, SD-CHST

Magnesium composite billets from Terves:
> TAX100E-1, TAX100E-2, TAX100E-3, TAX HDD-1, TAX HDD-2

Supplemental Declaration of Dr. Dana J. Medlin dated October 15, 2020 including the Exhibits thereto

**Physical Metallurgical Principles** – Second Edition by Robert E. Reed-Hill, McGraw-Hill, 1973.

Expert Report of Dr. Dana J. Medlin dated July 27, 2021, including the Exhibits thereto

**<u>The Science and Engineering of Materials</u>** – Fourth Edition by Donald R. Askeland and Pradeep P. Phulé, Thomson Brooks/Cole, 2003

**<u>Corrosion Engineering</u>** – Mars G. Fontana and Norbert D. Greene, McGraw-Hill, 1978.

**<u>Mechanical Behavior</u>** – Wayne Harden, William G. Moffatt, John Wulff, John Wiley & Sons, Inc., 1965.

Exhibit C

Deposition, Trial (T), Hearing (H), and Arbitration (A) Testimony of
Lee A. Swanger, Ph.D., P.E.

| FaAA Project | CASE # | LITIGANTS | SUBJECT OF TESTIMONY | P or D | COUNSEL | JURISDICTION | VENUE | DATE OF TESTIMONY |
|---|---|---|---|---|---|---|---|---|
| 1609531 | 01-15-004-9938 | GE Transportation Consolidated Precision Products | Metallurgical and Mechanical Engineering | P | John Scalzo Brian Rose | American Arbitration Assoc. Int'l Centre for Dispute Resol. | Cleveland, OH | 4/24/2017 |
| 1605143 | 3:15-13328 | Sigman, et al. CSX Transportation Sperry Rail Service | Metallurgical Engineering | D D | D. Blayne Honeycutt Robert Massie John D. "Jack" Hoblitzell, III | U.S. District Court | Southern District of West Virginia Huntington Division | 2/2/2018 |
| 1701076 | CV-2017-900038 | Pettway Vac-Con, Inc., et al. | Materials Engineering | D | Robert Mitchell Michael Truncale | Circuit Court | Mobile County Alabama | 2/19/2018 |
| 1708681 | 2012-CA-011871-O | Rutledge Probus Online, Inc. | Mechanical Engineering | P | W. Andrew Rariden Michael J. Merrill | Circuit Court 9th Judicial Circuit | Orange County Florida | 4/5/2018 |
| 1705741 | 2016-03483 | Sandbox Logistics Arrows Up, Inc | Materials Engineering Mechanical and | D | Matthew P. Whitley Stephen Loftin | Texas State Court 334th Judicial District | Harris County Texas | 4/18/2018 |
| 1804105 | 8:16-CV-1241-T-17JSS | Lidey Luehrs' Ideal Rides, Inc. | Mechanical Engineering | D | Jonathan D. Rubinstein James R. Brown | U.S. District Court | Middle District of Florida Tampa Division | 6/6/2018 |
| 1705741 | 2016-03483 | Sandbox Logistics Arrows Up, Inc. | Mechanical and Materials Engineering | D | Matthew P. Whitley Stephen Loftin | Texas State Court 334th Judicial District | Harris County Texas | 6/28/2018 T |
| 1801641 | 16-02709-MD-W-GAF | Browning Dollar General Corp. | Mechanical and Metallurgical Engineering | D | Ryan Casey R. Trent Taylor | U.S. District Court | Western District of Missouri Missouri | 7/18/2018 |
| 1708681 | 2012-CA-011871-O | Rutledge Central Florida Injury Probus Online | Mechanical Engineering | P | Andy Rariden Ronald Harrop Michael Merrill | Florida State Court Ninth Judicial Circuit | Orange County Florida | 10/23/2018 T |
| 1904058 | BC 646594 | Mamdouh Habib RR Street | Mechanical Engineering | D | Raphael Metzger John Thomas | California Superior Court Los Angeles Central District | Los Angeles, CA | 6/20/2019 |
| 1903771 | 18-009614 | Akif Ali GeoVera Specialty Insurance | Metallurgical Engineering | D | Geoffrey Gilbert Karen Brimmer | Circuit Court 17th Judicial Dstrt Broward County, FL | Broward County, FL | 8/23/2019 |
| 1505127 | 2017-025835-CA-01 | D Miami Investment Inc. NCH Pumbing, Inc. | Mechanical Engineering Materials Engineering | D | Natasha Rivera Alexander Alvarez | Circuit Court 11th Circuit Miami-Dade County, FL | Miami, FL | 9/6/2019 |
| 1907404 | 1:19-cv-01611-DCN | Terves LLC Yueyang Aerospace & Ecometal | Metallurgical Engineering Patent Infringement | P | David Cupar Evan Talley | US District Court Northern Ohio Eastern District | Cleveland, OH | June 3, 2020 |
| 1907404 | 1:19-cv-01611-DCN | Terves LLC Yueyang Aerospace & Ecometal | Metallurgical Engineering Patent Infringement | P | David Cupar Evan Talley | US District Court Northern Ohio Eastern District | Cleveland, OH | 12-Oct-20 |

Deposition, Trial (T), Hearing (H), and Arbitration (A) Testimony of
Lee A. Swanger, Ph.D., P.E.

| FaAA Project | CASE # | LITIGANTS | SUBJECT OF TESTIMONY | P or D | COUNSEL | JURISDICTION | VENUE | DATE OF TESTIMONY |
|---|---|---|---|---|---|---|---|---|
| 2008119 | 20-cv-21586-JEM | Milner<br>Scottsdale Insurance | Metallurgical Engineering | D | Maximo Santiago<br>Joseph Miele | U S District Court - Florida<br>Southern District | Miami-Dade County | 2/9/2021 |
| 1707055 | CACE 18 - 026778<br>CACE 18 - 026917 | Hollinger and McKenzie<br>Qualitiy Steel Corporation | Metallurgical Engineering | D | Joseph Slama<br>Robin Rothman | 17th Judicial Circuit<br>Broward County, Florida | Broward County FL | 2/22/2021 |
| 2002150 | CGC-98-999345<br>and CGC-98-999643 | City of Modesto, CA<br>DOW and PPG | Mechanical and<br>Materials Engineering | D | Duane Miller<br>Genaro Filice | State of California<br>County of San Francisco | County of San Francisco | 5/6/2021 |
| 1600068 | 5:14 - CV-01872-DSF | Betty Goldberg & Al Goldberg<br>Goss-Jewett Co. | Mechanical and<br>Materials Engineering | P | Bret Stone<br>Chris Johnson | U S District Court - California<br>Central District | Santa Barbara, CA | 5/18/2021<br>T |
| 1809042 | 18-003983 CA 01 | Jesus Carbonell, Jr.<br>Alvaco Enterprises, Inc. | Mechanical Engineering | D | J.C. Gonzalez<br>Anthony Torrente | 11th Judicial Circuit<br>Miami-Dade County | Miami-Dade Cty, Florida | 6/11/2021 |
| 1908910 | 2:18-cv-00456 | Eric Stevens et al. Class Action<br>Ford Motor Company | Mechanical Engineering<br>Materials - Tribology | D | Lauren Akers<br>Cole Geddy | US District Court - Texas<br>Southern District | Corpus Christi Division | 6/29/2021 |
| 1705257 | 6:18-CV-00213 | Stone Energy Corp.<br>Nippon Steel and Sumitomo | Materials - Corrosion | P | Matt Jones<br>Meghan Senter | US District Court - Louisiana<br>Western District | Lafayette Division | 7/20/2021 |

# Exhibit D

# Textbooks known to a POSITA

# The Science and Engineering of Materials

## FOURTH EDITION

Donald R. Askeland
*University of Missouri—Rolla, Emeritus*

Pradeep P. Phulé
*University of Pittsburgh*

**THOMSON**

**BROOKS/COLE**

Australia • Canada • Mexico • Singapore • Spain
United Kingdom • United States

**EXAMPLE 13-4**    *Design of a Casting Process for Wheels*

Design a casting process to produce automotive wheels having reduced weight and consistent and uniform properties.

**SOLUTION**

Many automotive wheels are produced by permanent mold casting of 356 aluminum alloy. In permanent mold casting, liquid aluminum is introduced into a heated cast iron mold and solidifies. Risers may be needed to assure that shrinkage voids are not created. This need may require that the wheel be designed to assure good casting characteristics, rather than to minimize weight. The casting may also cool at very different rates, producing differences in microstructure, such as secondary dendrite arm spacing, and properties throughout the wheel.

An alternative process might be to use the **thixocasting process** in which the material is stirred during solidification, producing a partly liquid, partly solid structure that behaves as a solid when no external force is applied, yet flows as a liquid under pressure. We would select an alloy with a wide-freezing range so that a significant portion of the solidification process occurs by the growth of dendrites. A hypoeutectic aluminum-silicon alloy might be appropriate. In the thixocasting process, the dendrites are broken up by stirring during solidification. The billet is later reheated to cause melting of just the eutectic portion of the alloy, and it is then forced into the mold in its semi-solid condition at a temperature below the liquidus temperature. When the alloy again solidifies, the primary aluminum phase will be uniform, round grains (rather than dendrites) surrounded by a continuous matrix of eutectic. Because approximately half of the alloy is already solid at the time of injection, the total amount of shrinkage is small, reducing the possibility of internal defects. This result also reduces the requirement for risers, which in turn provides more freedom in designing the wheel for its eventual function rather than for its ease of manufacture.

## 13-2    Magnesium and Beryllium Alloys

Magnesium, which is often extracted electrolytically from concentrated magnesium chloride in seawater, is lighter than aluminum with a density of 1.74 g/cm³, and it melts at a slightly lower temperature than aluminum.[3] In many environments, the corrosion resistance of magnesium approaches that of aluminum; however, exposure to salts, such as that near a marine environment, causes rapid deterioration. Although magnesium alloys are not as strong as aluminum alloys, their specific strengths are comparable. Consequently, magnesium alloys are used in aerospace applications, high-speed machinery, and transportation and materials handling equipment.

Magnesium, however, has a low modulus of elasticity ($6.5 \times 10^6$ psi) and poor resistance to fatigue, creep, and wear. Magnesium also poses a hazard during casting and machining, since it combines easily with oxygen and burns. Finally, the response of magnesium to strengthening mechanisms is relatively poor.



**Figure 13-5**
The magnesium-aluminum phase diagram.

**Structure and Properties**   Magnesium, which has the HCP structure, is less ductile than aluminum. However, the alloys do have some ductility because alloying increases the number of active slip planes. Some deformation and strain hardening can be accomplished at room temperature, and the alloys can be readily deformed at elevated temperatures. Strain hardening produces a relatively small effect in pure magnesium because of the low strain-hardening coefficient (Chapters 6 and 7).

As in aluminum alloys, the solubility of alloying elements in magnesium at room temperature is limited, causing only a small degree of solid-solution strengthening. However the solubility of many alloying elements increases with temperature, as shown in the Mg-Al phase diagram (Figure 13-5). Therefore, alloys may be strengthened by either dispersion strengthening or age hardening. Some age-hardened magnesium alloys, such as those containing Zr, Th, Ag, or Ce, have good resistance to overaging at temperatures as high as 300°C. Alloys containing up to 9% Li have exceptionally light weight. Properties of typical magnesium alloys are listed in Table 13-6.

**TABLE 13-6 ■ *Properties of typical magnesium alloys***

| Alloy | Composition | Tensile Strength (psi) | Yield Strength (psi) | % Elongation |
|---|---|---|---|---|
| **Pure Mg:** | | | | |
| Annealed | | 23,000 | 13,000 | 3–15 |
| Cold-worked | | 26,000 | 17,000 | 2–10 |
| **Casting alloys:** | | | | |
| AM 100-T6 | 10% Al-0.1% Mn | 40,000 | 22,000 | 1 |
| AZ81A-T4 | 7.6% Al-0.7% Zn | 40,000 | 12,000 | 15 |
| ZK61A-T6 | 6% Zn-0.7% Zr | 45,000 | 28,000 | 10 |
| **Wrought alloys:** | | | | |
| AZ80A-T5 | 8.5% Al-0.5% Zn | 55,000 | 40,000 | 7 |
| ZK40A-T5 | 4% Zn-0.45% Zr | 40,000 | 37,000 | 4 |
| HK31A-H24 | 3% Th-0.6% Zr | 38,000 | 30,000 | 8 |

# Corrosion Engineering

**MARS G. FONTANA**

*Professor and Chairman*
*Department of Metallurgical Engineering*
*Director, Corrosion Center*
*The Ohio State University*

**NORBERT D. GREENE**

*Professor of Materials Engineering*
*Director, Corrosion Research Laboratory*
*Rensselaer Polytechnic Institute*

**McGRAW-HILL BOOK COMPANY**

*New York   St. Louis*
*San Francisco*
*Toronto   London*
*Sydney*



*Fig. 4-7. Heating-tube test in pilot plant.*

advantage of this type of test is that sometimes solids deposit on heating surfaces and cause rapid attack. Clipping a sheet specimen (like a clamp) on an existing heating coil or tube is another method for simulating actual temperatures.

**4-13  Standard Expression for Corrosion Rate**  In most cases, aside from contamination problems, the primary concern is the life (usually life in years) of the equipment involved. A good corrosion-rate expression should involve (1) familiar units, (2) easy calculation with minimum opportunity for error, (3) ready conversion to life in years, (4) penetration, and (5) whole numbers without cumbersome decimals.

The senior author began promoting the expression mils per year in 1945, and it is now widely used. The formula for calculating this rate is

$$\text{Mils per year} = \frac{534W}{DAT}$$

as discussed in Chap. 2.

Conversion from other units to obtain mils per year is

| Multiply | By |
|---|---|
| In./yr | 1000 |
| In./month | 12,100 |
| Mg/dm²/day (mdd) | 1.44/specific gravity |

# MECHANICAL BEHAVIOR

Wayne Hayden

William G. Moffatt

John Wulff

JOHN WILEY & SONS, INC. *New York · London · Sydney*

CHAPTER ONE

# Mechanical Tests

The fabrication and use of materials depend in large measure on such mechanical properties as strength, hardness, and ductility. Numerical data describing these properties may be obtained from standard types of tensile, hardness, impact, creep, and fatigue tests discussed in this chapter.

## 1.1  INTRODUCTION

Since the selection of a material for a particular structural application depends on its mechanical properties, it is important to be familiar with some of the standard tests used to measure these properties and to understand the significance of the information obtained from these tests.  The capacity of a material to withstand a static load can be determined by testing that material in *tension* or *compression*.  Information about its resistance to permanent deformation can be gained from *hardness tests*.  *Impact tests* are used to indicate the *toughness* of a material under shock loading conditions.  When conducted over a series of temperatures, they can be used to uncover any temperature-dependent transition from ductility to brittleness.  *Fatigue tests* measure a material's useful lifetime under a cyclic load.  *Creep* and *stress-rupture* tests are conducted to evaluate the behavior of a material when subjected to a load at high temperatures for a long time. The results of these and more specialized tests are often of more empirical than fundamental significance.  They can be, nonetheless, useful to the designer, fabricator, and research worker.

1

2    Behavior of Materials



Figure 1.1    Schematic drawing of a tensile-testing apparatus.

## 1.2    THE TENSILE TEST

Of all the tests used to evaluate mechanical properties, the tensile test, in which a sample is pulled to failure in a relatively short period of time, is perhaps the most useful.  In this test (see Figure 1.1) the sample is elongated at a constant rate, and the load necessary to produce a given elongation is measured as a dependent variable.

A *load-elongation* curve may be plotted from the results of a tension test.  These results are usually restated in terms of stress and strain, which are independent of the geometry of the sample.

*Engineering stress*, $\sigma$, is defined as the ratio of the load on the sample, $P$, to the original cross-sectional area, $A_0$:

$$\sigma = \frac{P}{A_0} \qquad (1.1)$$

*Engineering strain*, $\varepsilon$, is defined as the ratio of the change in length of the sample, $\Delta l$, to its original length $l_0$:

$$\varepsilon = \frac{l - l_0}{l_0} = \frac{\Delta}{l_0}$$

An engineering stress-strain curve for shown in Figure 1.2.

At the beginning of the test, the ma this signifies that if the load is released, its original length.  The material is said *limit* when the load is sufficient to initia able, deformation; in other words, it wi original length if the load is released.  (T portion of the total elongation which i plastic deformation a net elongation rem further elongated, the engineering stress i is said to *work harden* or *strain harden* maximum at the *ultimate tensile strength* ple develops a neck: this is a local decrea at which further deformation is concentr begun, the engineering stress decreases wi sample fractures.  In materials which frac ultimate tensile strength and the fractur but when necking occurs, the load at fra load at the ultimate tensile strength.

Figure 1.3 shows the engineering stress materials.  The relation between stress a region is linear for metals and ceramic *Hooke's law*:

$$\sigma = E\varepsilon$$

where $E$ is a constant, *Young's modulus*. the maximum elastic strain is usually less cent.  In rubber and other elastomers, th ship is nonlinear, and recoverable elastic dred percent can be produced.  The poir is no longer elastic, but plastic, is that str the stress-strain curve deviates from th Figure 1.2).  Because of the difficulty of precisely, various approximations are freq common of these is the *offset yield strength* fied as the stress at 0.2 percent plastic stra

$$\varepsilon = \frac{l - l_0}{l_0} = \frac{\Delta l}{l_0} \qquad (1.2)$$

An engineering stress-strain curve for polycrystalline copper is shown in Figure 1.2.

At the beginning of the test, the material extends elastically; this signifies that if the load is released, the sample will return to its original length. The material is said to have passed its *elastic limit* when the load is sufficient to initiate plastic, or nonrecoverable, deformation; in other words, it will no longer return to its original length if the load is released. (There is always an elastic portion of the total elongation which is recovered, but during plastic deformation a net elongation remains.) As the sample is further elongated, the engineering stress increases and the material is said to *work harden* or *strain harden*. The stress reaches a maximum at the *ultimate tensile strength*. At this point, the sample develops a neck: this is a local decrease in cross-sectional area at which further deformation is concentrated. After necking has begun, the engineering stress decreases with further strain until the sample fractures. In materials which fracture without necking, the ultimate tensile strength and the fracture strength are the same, but when necking occurs, the load at fracture is lower than the load at the ultimate tensile strength.

Figure 1.3 shows the engineering stress-strain curves for several materials. The relation between stress and strain in the elastic region is linear for metals and ceramics and is described by *Hooke's law*:

$$\sigma = E\varepsilon \qquad (1.3)$$

where $E$ is a constant, *Young's modulus*. In metals and ceramics the maximum elastic strain is usually less than one-half of a percent. In rubber and other elastomers, the stress-strain relationship is nonlinear, and recoverable elastic strains of several hundred percent can be produced. The point at which deformation is no longer elastic, but plastic, is that stress at which the slope of the stress-strain curve deviates from the elastic modulus (see Figure 1.2). Because of the difficulty of determining this point precisely, various approximations are frequently used. The most common of these is the *offset yield strength*, which is usually specified as the stress at 0.2 percent plastic strain.

4



Figure 1.2   Engineering stress-strain diagram for polycrystalline copper.  (*a*) Complete diagram.  (*b*) Elastic region and initial plastic region showing 0.2% offset yield strength.

During elastic deformation there is a slight change in volume of a metal or ceramic sample; during plastic...

Figure 1.4*a* shows a sample of low-carbon steel bands have partially progressed down the length...

In low-carbon steels and several other alloys, an *upper yield point*, and the stress then decreases to a *lower yield point* (see Figure 1.3*a*). This behavior stems from inhomogeneous deformation which begins at a point in the specimen in the form of observable bands...

Figure 1.3   Engineering stress-strain curves for several...
(*a*) 1030 Steel.  (*b*) Cemented tungsten carbide.  (*c*) Plaster...



Mechanical Tests    5



Figure 1.3    Engineering stress-strain curves for several engineering materials.
(a) 1030 Steel.  (b) Cemented tungsten carbide.  (c) Plaster of Paris.  (d) Soft rubber.

In low-carbon steels and several other alloys yielding begins at an *upper yield point*, and the stress then decreases to a *lower yield point* (see Figure 1.3a).  This behavior stems from the nonhomogeneous deformation which begins at a point of stress concentration (often near the specimen grips) and propagates through the specimen in the form of observable bands (Lüder's bands).  Figure 1.4a shows a sample of low-carbon steel in which Lüder's bands have partially progressed down the length of the sample.

During elastic deformation there is a slight change in the volume of a metal or ceramic sample; during plastic deformation,

6    Behavior of Materials



(a)                    (b)

Figure 1.4    Examples of nonhomogeneous deformation.  (a) Lüder's band in steel (1×).  (From R. B. Liss, *Acta Metallurgica*, Vol. 5, No. 6, June, 1957.)  (b) Necking in steel.

however, there is no change in the volume of the sample when measured in the unloaded state.  This may be stated mathematically as

$$A_0 l_0 = A_i l_i = \text{constant} \tag{1.4}$$

When a material is elongated, its cross-sectional area must, therefore, decrease.  During elastic deformation this change is negligible, but during plastic deformation the reduction in area can be appreciable.  It is often preferable for this reason to redefine "stress" and "strain" when considering plastic deformation and to employ the expressions "true stress" and "true strain."  *True*

*stress* is defined as the ratio of the lo[...] instantaneous minimum cross-sectional a[...]

$$\sigma_T = \frac{P}{A_i}$$

*True strain* is defined as the integral of th[...] change in length to the instantaneous len[...]

$$\epsilon = \int_{l_0}^{l_i} \frac{dl}{l}$$

The true strain in a plastically deformed [...] $l_0$ and instantaneous length $l_i$ (measured[...] may be calculated by integration of equa[...]

$$\epsilon = \ln\left(\frac{l_i}{l_0}\right)$$

If measurements are made while the sam[...] must be made for the small amount of el[...] contributes to the observed elongation.[...] the expression:

$$(\epsilon)_{\text{loaded}} = \ln\left(\frac{l_i}{l_0}\right) - [...]$$

A true stress-true strain curve for p[...] shown in Figure 1.5.  Certain fundame[...] observed between this curve and the pla[...] neering stress-strain curve for the same m[...] 1.2.  True stress is not at its greatest at t[...] as is engineering stress; instead, it increa[...] and reaches a maximum at fracture.  Sin[...] geneous deformation, it is no longer mea[...] ning of necking to consider the over-all [...] determining the strain.  Instead, the tru[...]

$$\epsilon = \ln\left(\frac{A_0}{A_i}\right)$$

When the increase in stress necessary to [...] material is finally counterbalanced by t[...] stress due to the decreasing cross-sectio[...]

*stress is* defined as the ratio of the load on the sample to the instantaneous minimum cross-sectional area supporting that load:

$$\sigma_T = \frac{P}{A_i} \qquad (1.5)$$

*True strain* is defined as the integral of the ratio of an incremental change in length to the instantaneous length of the sample:

$$\epsilon = \int_{l_0}^{l_i} \frac{dl}{l} \qquad (1.6)$$

The true strain in a plastically deformed specimen of initial length $l_0$ and instantaneous length $l_i$ (measured in the unstressed state) may be calculated by integration of equation 1.6:

$$\epsilon = \ln\left(\frac{l_i}{l_0}\right) \qquad (1.7)$$

If measurements are made while the sample is loaded, correction must be made for the small amount of elastic strain which always contributes to the observed elongation.  This may be done with the expression:

$$(\epsilon)_{\text{loaded}} = \ln\left(\frac{l_i}{l_0}\right) - \frac{\sigma_T}{E} \qquad (1.8)$$

A true stress-true strain curve for polycrystalline copper is shown in Figure 1.5.  Certain fundamental differences may be observed between this curve and the plastic portion of the engineering stress-strain curve for the same material shown in Figure 1.2.  True stress is not at its greatest at the initiation of necking, as is engineering stress; instead, it increases with increasing strain and reaches a maximum at fracture.  Since necking is nonhomogeneous deformation, it is no longer meaningful after the beginning of necking to consider the over-all length of the sample in determining the strain.  Instead, the true strain during necking

$$\epsilon = \ln\left(\frac{A_0}{A_i}\right) \qquad (1.9)$$

When the increase in stress necessary to continue deforming the material is finally counterbalanced by the increase in applied stress due to the decreasing cross-sectional area, the material

8    Behavior of Materials



Figure 1.5   True stress-strain curve for polycrystalline copper.

necks, or starts to deform locally at decreasing loads. Mathematically, this can be expressed as:

$$\partial P = 0 = \sigma_T \, \partial A + A \, \partial \sigma_T$$

$$\frac{\partial \sigma_T}{\sigma_T} = -\frac{\partial A}{A} = \partial \epsilon \tag{1.10}$$

In many metals, work-hardening occurs in an approximately parabolic manner, which may be expressed as

$$\sigma_T = K\epsilon^n \tag{1.11}$$

where $K$ is a constant and $n$ is the work-hardening exponent (always less than one). In materials whose behavior is described by Equation 1.11, necking begins when the true strain is equal to the work-hardening exponent.

The results of the tensile test are extremely useful to the designer. In most engineering structures only elastic deformation is desirable; a knowledge of the yield strength thus establishes the maximum load that can safely be employed (which is then usually reduced by a safety factor). Many techniques of fabrication, such

as rolling, wire drawing, and stamping, depen[d] metal to withstand appreciable plastic deform[a]ture. Here it is important to know the ductil[i] hardening of the material being worked. [T] stress-strain curve in the tension test shows [t] before fracture and thus indicates the *toughne*[ss]

## 1.3   THE COMPRESSION TEST

Because of the presence of submicroscopic [c] rials are often weak in tension, as tensile stres[s] those cracks which are oriented perpendicula[r] sion. The tensile strengths they exhibit are l[ow] from sample to sample. These same materi[als] be quite strong in compression. Brittle mate[r] in compression, where their strengths are mu[ch] shows a comparison of the compressive and [t] gray cast iron and concrete, both of which a[re] A schematic diagram of a typical compressi[on] Figure 1.7.

Because the compression test increases the [area] of the sample, necking never occurs. Extrem[ely] are seldom tested in compression because [they] strained by friction at the points of contact wi[th] apparatus. This constraint gives rise to a co[m] tribution which can only be analyzed in an a[pproximate]



Figure 1.6   Tensile and compressive engineering stress-[strain] iron and concrete.

CHAPTER TWO

# Elastic Properties

Elastic deformation of solids is limited. The strain induced in
them by a given stress completely disappears when the stress is
removed. The relationship between stress and strain, which is
linear in some materials but highly nonlinear in others, may be
correlated qualitatively with the structure and type of atomic
bonding present. This stress-strain relationship also depends on
temperature and, in single crystals, or specifically worked mate-
rials, on crystallographic direction.

## 2.1  INTRODUCTION

All materials change in shape, volume, or both under the influ-
ence of an applied stress or a temperature change. The deforma-
tion is called *elastic* if the stress- or temperature-induced change
in shape or volume is completely recovered when the material is
allowed to return to its original temperature or state of stress. In
crystalline substances the relationship between stress and strain in
the elastic region is typically linear, whereas noncrystalline long-
chain molecular materials generally exhibit nonlinear elastic behav-
ior. Two graphs of stress ($\sigma$) versus strain ($\varepsilon$) are shown in
Figure 2.1.

The simple mathematical theory of *linear elasticity* considerably
antedates any detailed knowledge of the atomic basis of the behav-
ior observed and merely deals with the proportionality between
stress and strain on a macroscopic scale, utilizing elastic constants
which can be determined by tests of the sort described in Chap-
ter 1. For example, the equation for the linear portion of the
tensile stress-strain curve (Figure 2.1a) is $\sigma = E\varepsilon$, where $E$ is the

23

Ex. 8 - Terves Motion for Summary Judgment
Page 65 of 71

24    Behavior of Materials



Figure 2.1   (a) Linear and (b) nonlinear elastic behavior.  Point A on each curve represents the end of the elastic region.



Figure 2.2   Uniaxial tensile (or compressive) stress. of transverse to axial strain.  Dashed lines repres a cube of edge length $l_0$.

proportionality constant, Young's modulus.  The value of Young's modulus may be determined by other means: for example, if $v$ is the velocity of sound in a material of density $\rho$, and Young's modulus $E$, then

$$v = \sqrt{E/\rho} \qquad (2.1)$$

Several different elastic proportionality constants are in common use; they differ only in the types of stress and strain which they relate:

*Poisson's ratio*, $v$, another elastic constan verse to axial strain (see Figure 2.2):

$$v = \frac{-\varepsilon_y}{\varepsilon_z}$$

Young's modulus    $E = \dfrac{\sigma}{\varepsilon}$    (2.2)

Shear modulus    $G = \dfrac{\tau}{\gamma}$    (2.3)

Bulk modulus    $K = \dfrac{\sigma_{\text{Hyd}}}{\Delta V/V_0}$    (2.4)



In the above equations, $\sigma$ is uniaxial tensile or compressive stress, $\tau$ is shear stress, $\sigma_{\text{Hyd}}$ is *hydrostatic* tensile or compressive stress, $\varepsilon$ is normal strain, $\gamma$ is shear strain and $\Delta V/V_0$ is fractional volume expansion or contraction.  Figures 2.2, 2.3, and 2.4 illustrate the geometric relationship between stress and strain of the types described in the three equations above.

Figure 2.3   Geometry of shear stress–shear strain represent initial stress-free shape: a cube of edge leng as indicated, would also occur.)  Shear strain $\gamma = \delta/l$



Figure 2.2   Uniaxial tensile (or compressive) stress.   Poisson's ratio, $\nu$, is the ratio of transverse to axial strain.   Dashed lines represent initial stress-free shape: a cube of edge length $l_0$.

*Poisson's ratio, $\nu$*, another elastic constant, is the ratio of transverse to axial strain (see Figure 2.2):

$$\nu = \frac{-\varepsilon_y}{\varepsilon_z} \qquad (2.5)$$



Figure 2.3   Geometry of shear stress–shear strain relationship.   Dashed lines represent initial stress-free shape: a cube of edge length $l_0$.   (A rigid body rotation, as indicated, would also occur.)   Shear strain $\gamma = \delta/l_0 = \tan\theta$.

26    Behavior of Materials





Figure 2.4 Hydrostatic stress versus volume change. Dashed lines surrounding cube represent initial stress-free size.

In isotropic elasticity, if any two of the four elastic constants, $E$, $G$, $K$, and $\nu$, are known for a material which is homogeneous (in which the properties do not vary from point to point) and isotropic (in which the properties at a point are identical in all directions) the other two may be derived:

$$K = \frac{E}{3(1-2\nu)} \qquad (2.6)$$

$$G = \frac{E}{2(1+\nu)} \qquad (2.7)$$

$$\nu = \frac{E}{2G} - 1 \qquad (2.8)$$

See Problems 2.9 and 2.11 for a derivation of Equations 2.6 and 2.7. Equation 2.8 is merely a rearrangement of Equation 2.7.

## 2.2 ATOMIC BASIS OF ELASTIC BEHAVIOR

The potential energy $V$ of a pair of atoms may be expressed as a function of the distance of their separation $r$:

$$V = \frac{-A}{r^n} + \frac{B}{r^m} \qquad (2.9)$$

where $A$ and $B$ are, respectively, the propor⟨tionality constants for⟩ attraction and repulsion and $n$ and $m$ are⟨⟩ appropriate variation of $V$ with $r$. Expres⟨sions for the forces of⟩ attraction and repulsion existing between t⟨wo atoms may be⟩ derived from the expression for potential en⟨ergy:⟩

$$F = \frac{-\partial V}{\partial r} = \frac{-nA}{r^{n+1}} + \frac{n⟨}{r⟩}$$

Letting $nA = a$, $mB = b$, $n + 1 = N$ and $m⟨$⟩

$$F = \frac{-a}{r^N} + \frac{b}{r^M}$$

Plots of the curves (Condon-Morse curv⟨es⟩ and 2.11, which, clearly, have the same form⟨⟩ 2.5. The value of $r$ corresponding to the ⟨minimum⟩ energy is the equilibrium spacing, $d_0$, of the⟨⟩ force is zero at $d_0$, and a displacement in eit⟨her⟩ restoring forces into play. Although thes⟨e⟩ behavior of an isolated atom pair, the sam⟨e⟩ exhibited as a free atom approaches an exi⟨sting⟩ net attractive force at first exists (potenti⟨al⟩



Figure 2.5 Condon-Morse curves showing qualitative⟨⟩ (b) force with distance of separation, $r$, of atoms.

26    Behavior of Materials



Figure 2.4    Hydrostatic stress versus volume change.   Dashed lines surrounding cube represent initial stress-free size.

In isotropic elasticity, if any two of the four elastic constants, $E$, $G$, $K$, and $\nu$, are known for a material which is homogeneous (in which the properties do not vary from point to point) and isotropic (in which the properties at a point are identical in all directions) the other two may be derived:

$$K = \frac{E}{3(1 - 2\nu)} \tag{2.6}$$

$$G = \frac{E}{2(1 + \nu)} \tag{2.7}$$

$$\nu = \frac{E}{2G} - 1 \tag{2.8}$$

See Problems 2.9 and 2.11 for a derivation of Equations 2.6 and 2.7.   Equation 2.8 is merely a rearrangement of Equation 2.7.

## 2.2   ATOMIC BASIS OF ELASTIC BEHAVIOR

The potential energy $V$ of a pair of atoms may be expressed as a function of the distance of their separation $r$:

$$V = \frac{-A}{r^n} + \frac{B}{r^m} \tag{2.9}$$

where $A$ and $B$ are, respectively, the pro[portionality constants for] attraction and repulsion and $n$ and $m$ a[re] appropriate variation of $V$ with $r$.   Exp[ressions for the forces of] attraction and repulsion existing betwee[n the atoms may be] derived from the expression for potential [energy:]

$$F = \frac{-\partial V}{\partial r} = \frac{-nA}{r^{n+1}} +$$

Letting $nA = a$, $mB = b$, $n + 1 = N$ and

$$F = \frac{-a}{r^N} + \frac{b}{r^M}$$

Plots of the curves (*Condon-Morse* cu[rves) are shown in Figures 2.10] and 2.11, which, clearly, have the same fo[rm as those in Figure] 2.5.   The value of $r$ corresponding to the [minimum potential] energy is the equilibrium spacing, $d_0$, of t[he atoms. The net] force is zero at $d_0$, and a displacement in [either direction brings] restoring forces into play.   Although th[ese diagrams show the] behavior of an isolated atom pair, the sa[me general behavior is] exhibited as a free atom approaches an e[quilibrium site. A] net attractive force at first exists (pote[ntial energy decreases)]



Figure 2.5   Condon-Morse curves showing qualitativ[e variation of (a) energy and]
(b) force with distance of separation, $r$, of atoms.

# Physical Metallurgy Principles

## Second Edition

University Series in Basic Engineering

ⓒ 1973

## Robert E. Reed-Hill



D. VAN NOSTRAND COMPANY

NEW YORK  CINCINNATI  TORONTO  LONDON  MELBOURNE

# 8 Solid Solutions

8.1 Inte
tures or phases are c
components (pure m
tions, they are, in all
structures occur with
atoms, they are intern

When homogeneous mixtures of two or more kinds of atoms occur in the solid state, they are known as *solid solutions.* These crystalline solutions are quite common and equivalent to liquid and gaseous forms, for the proportions of the components can be varied within fixed limits, and the mixtures do not separate naturally. In addition, the term *solvent* refers to the more abundant atomic form, and *solute* to the less abundant.

Solid solutions occur in either of two distinct types. The first is known as a *substitutional solid solution.* In this case, a direct substitution of one type of atom for another occurs so that solute atoms enter the crystal to take positions normally occupied by solvent atoms. Figure 8.1A shows schematically an example containing two kinds of atoms (Cu and Ni). The other type of solid solution is shown in Fig. 8.1B. Here the solute atom (carbon) does not displace a solvent atom, but, rather, enters one of the holes, or interstices, between the solvent (iron) atoms.

The difference bet
more easily understoc
form brass, a numbe
ranges. Most of these
whatsoever, but that
one of copper is fou
this new phase is bo
cubic, and zinc is c
structure can exist o
room temperature b
compound, but a sol
iron, a definite interm
composition (6.67 w
(orthorhombic, with
quite different from
(graphite).

8.2 Inte
shows that solute a
conditions which dete
alloy systems have b
According to their res
solute atom has an ap
four most important i
hydrogen, all of which

Atomic size is n
interstitial solid soluti
more readily in tran
carbon is so insolubl
are frequently used
transition metals are

Iron
Titaniu
Zirconi
Nickel



**Fig. 8.1** The two basic forms of solid solutions. *Note:* In the interstitial example on the right, carbon is shown in solid solution in the face-centered cubic form of iron. Fig. 8.2 considers carbon dissolved interstitially in the body-centered cubic form of iron.

326